UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

NEW YORK STATE FIREARMS ASSOCIATION, et al.

                          Plaintiffs,

                                                          Case # 23-CV-6524-FPG

v.

                                                          DECISION AND ORDER

STEVEN A. NIGRELLI, in his capacity as
Acting Superintendent of the New York State Police, *et al.*,

                          Defendants.

## INTRODUCTION

Under the Concealed Carry Improvement Act ("CCIA"), effective September 13, 2023, firearms dealers and sellers of ammunition are required to perform background checks on purchasers of ammunition before each purchase of ammunition, unless the purchaser is also a licensed firearms dealer or seller of ammunition. *See generally* N.Y. Penal Law §§ 400.02, 400.03, N.Y. Exec Law § 228. Moreover, the CCIA requires the licensed dealers to pay a fee to cover the cost of performing the background check, which fee shall not exceed the direct and indirect costs incurred. N.Y. Exec. Law § 228(5)(a).

Plaintiffs are George Borrello, David DiPietro and William Ortman, who each own and possess firearms that require ammunition. ECF No. 4 at 3. Plaintiff, New York State Firearms Association ("NYSFA"), is a nonprofit membership organization with almost 10,000 members who live in New York state and own firearms that require ammunition. ECF No. 4 at 4. The executive director of NYSFA is Plaintiff Aaron Dorr, who also owns and possesses firearms that require ammunition. ECF No. 4 at 4.

1

Plaintiffs Borrello, DiPietro, and Ortman allege that "but for the background check and associated fee, [they] would purchase ammunition from licensed firearms dealers." ECF No. 4 at 7. Dorr alleges that he would have purchased ammunition despite the background check and associated fees, but at the time he attempted to purchase ammunition "the statewide license and record database was not working" and so he could not complete the purchase. ECF No. 5-4 at 2-3. Plaintiffs DiPietro and Ortman further allege that DiPietro would like to sell ammunition to Ortman, but that they cannot engage in this transaction without incurring a fine unless they "involv[e] a licensed dealer in firearms or registered seller of ammunition" or unless "Mr. DiPietro register[s] as a seller of ammunition." ECF No. 4 at 8.

Plaintiffs allege that the ammunition background check and associated fees imposed under the CCIA infringe upon their right to bear arms under the Second Amendment of the United States Constitution. Plaintiffs, therefore, bring this action against Defendant, Steven A. Nigrelli, in his official capacity as acting superintendent of the New York State Police, under 42 U.S.C. § 1983. *See generally* ECF No. 4. They seek injunctive and declaratory relief. Pending further proceedings on this action, Plaintiffs have also filed the present motion for a temporary restraining order ("TRO"), a preliminary injunction, and an expedited hearing on the preliminary injunction. ECF Nos. 5, 6.

For the reasons discussed below, the Court DENIES Plaintiffs' TRO request, and issues a standard scheduling order for preliminary injunction motion.

## DISCUSSION

### I. Temporary Restraining Order

"In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction." *Antonyuk v. Hochul*, No. 22-CV-986, 2022

WL 5239895, at *3 (N.D.N.Y. Oct. 6, 2022). "A party seeking a preliminary injunction must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *De Jesus Moreno v. Nielsen*, 460 F. Supp. 3d 291, 297 (E.D.N.Y. 2020) (internal quotation marks omitted).

### A. Irreparable Harm

"The denial of a constitutional right ordinarily warrants a finding of irreparable harm, even when the violation persists for minimal periods of time." *A.H. by & through Hester v. French*, 985 F.3d 165, 184 (2d Cir. 2021); *see also Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). However, "the mere allegation of a constitutional infringement itself does not constitute irreparable harm." *Lore v. City of Syracuse*, No. 00-cv-1833, 2001 WL 263051, at *6 (N.D.N.Y. Mar. 9, 2001). Indeed, the presumption of irreparable harm is triggered only where the alleged constitutional deprivation "is convincingly shown and that violation carries non-compensable damages." *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012) (*citing Donohue v. Paterson*, 715 F. Supp. 2d 306, 315 (N.D.N.Y. 2010)). And "the Court cannot determine whether the constitutional deprivation is convincingly shown without assessing the likelihood of success on the merits." *Id.* at 150 (*citing Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000)).

As discussed below, Plaintiffs have failed to demonstrate a likelihood of success on the merits on any of their claims—that is, Plaintiffs have not convincingly shown a constitutional deprivation. S*ee Donohue*, 886 F. Supp. 2d at 150. Accordingly, the Court will not presume that

Plaintiffs have established irreparable harm and the Plaintiffs have not otherwise established that they face suffering an irreparable harm. *See* Fed. R. Civ. P. 65(b)(1)(A) (stating that a court may issue a TRO without notice only if the movant clearly shows that "immediate and irreparable injury . . . will result to the movant *before* the adverse party can be heard in opposition" (emphasis added)).

### B. Likelihood of Success on the Merits

"To establish a likelihood of success on the merits, a plaintiff must show that it is more likely than not to prevail on its claims, or, in other words, that the probability of prevailing is 'better than fifty percent.'" *Gazzola v. Hochul*, No. 122CV1134, 2022 WL 17485810, at *9 (N.D.N.Y. Dec. 7, 2022) (internal quotations omitted).

Plaintiffs assert that they are likely to succeed on the merits of their claim, arguing that the CCIA cannot survive scrutiny under the Supreme Court's holding in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). In *Bruen*, the Supreme Court held that a government's regulation of the right to bear arms must be "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. Plaintiffs contend that "New York's never-ending background checks for ammunition purchases are novel and enjoy no historical support," ECF No. 5-1 at 5, and for this reason, are unconstitutional under *Bruen*. The Court does not find that this claim is likely to succeed on the merits.

"The Second Amendment protects 'arms,' 'weapons,' and 'firearms'; it does not explicitly protect ammunition." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). Nevertheless, because arms lose their deadly force without ammunition, courts have consistently held that ammunition is protected by the Second Amendment. *United States v. Miller*, 307 U.S. 174, 180 (1939) ("The possession of arms also implied the possession of ammunition."); s*ee also*

4

*Jackson*, 746 F.3d at 967 ("Without bullets, the right to bear arms would be meaningless."); *Nat'l Ass'n for Gun Rts. v. Lamont*, No. CV 3:22-1118, 2023 WL 4975979, at *19 (D. Conn. Aug. 3, 2023) ("Components of firearms that are necessary to their operation, such as ammunition, are covered by the Second Amendment."). The protection that ammunition enjoys under the Second Amendment is derivative of the right to bear arms. Therefore, reviewing courts do not distinguish between laws impacting access to ammunition from laws restricting access to arms themselves. *See, e.g., United States v. Jimenez*, 895 F.3d 228, 234 (2d Cir. 2018) ("We have routinely assumed that the Second Amendment applies to a given application of a firearms (or ammunition) regulation."); *United States of America, v. Calvin Lewis*, No. 21 CR. 789, 2023 WL 6066260, at *6 (S.D.N.Y. Sept. 18, 2023) ("[T]he historical laws and regulations discussed supra permitted the Government to disarm certain individuals based on concerns over their threat to community safety . . . [by prohibiting] a person from possessing weapons (and, in some cases, ammunition) in [certain] circumstances.").

The Supreme Court has consistently upheld background checks as a constitutionally permissible component of "shall-issue" firearms licensing regimes. Indeed, the majority in *Bruen* made clear that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States shall-issue licensing regimes" that "require applicants to undergo a background check or pass a firearms safety course." *Bruen*, 142 S. Ct. at 2138 n.9. According to the majority, these background checks "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). The majority explained further that these shall-issue regimes with background checks impose "narrow, objective, and definite standards" rather than requiring the "appraisal of

facts, the exercise of judgment, and the formation of an opinion." *Id.* (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969) and *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)).

The CCIA is comparable to the "shall-issue" regimes sanctioned by *Bruen*. So long as ammunition purchasers pass the background check, licensed dealers and sellers of ammunition have no discretion to withhold ammunition based on any "formation of an opinion." *Cantwell*, 310 U.S. at 305. Rather, they have "narrow, objective, and definite standards to follow," *Shuttlesworth*, 394 U.S. at 151, to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens at the time they seek to render their arms deadly through the purchase of ammunition. *Bruen*, 142 S. Ct. at 2138 n.9.

Plaintiffs complain that the frequency of the background checks are "novel" and burdensome because "unlike ordinary one-time background checks associated with firearms, New York's ahistorical scheme applies indiscriminately with each purchase of ammunition." ECF No. 5-1 at 6-7. Plaintiff's analogy is unpersuasive. First, while gunowners submit to one background when purchasing a firearm, they must submit to one background check for each new firearm purchase. *See, e.g.*, 18 U.S.C. § 922(t)(1)(A) ("[A] licensed dealer shall not transfer a firearm to any other person who is not licensed under this chapter, unless before the completion of the transfer, the licensee contacts the national instant criminal background check system."). At this most basic level, purchasing ammunition under the CCIA functions in the same manner—one background check per purchase.

Plaintiff's analogy is also unpersuasive because it tends to imply that gunowners are free from ongoing inspection by the government. On the contrary, requiring gunowners to submit to multiple background checks is not novel. Constitutionally permissible gun licensing regimes often involve a renewal process whereby the government reconfirms that the gunowner continues to be

6

a law-abiding citizen by requiring the gunowner to submit to a background check at the time of renewal. *See, e.g.*, New York City Admin. Code § 10-131(a)(2) ("Every license to carry or possess a pistol or revolver in the city may be issued for a term of no less than one or more than three years.").

While a background check associated with the purchase of ammunition may be performed more frequently than a background check that accompanies the purchase of firearms themselves, that frequency is determined by the purchaser and not the government. Further, Plaintiffs concede that, when operable, New York's background check system for ammunition is instantaneous and does not extend out for a period of days, as is customary under constitutionally permissible licensing regimes. Meanwhile, even *Bruen* endorsed licensing regimes that required taking gun safety classes, which are even more time consuming than an instantaneous background check. *See Bruen*, 142 S. Ct. at 2138 n.9 ("Nothing in our analysis should be interpreted to suggest the unconstitutionality of . . . licensing regimes" that "require applicants to . . . pass a firearms safety course."). None of that is involved here.

Plaintiffs also complain of the fees, arguing that "it is beyond the authority of government to precondition the exercise of an enumerated right on the payment of a special fee." ECF No. 5-1 at 8. Plaintiffs are incorrect for several reasons. First, the fee provision under CCIA is payable by the dealer, not the purchaser. At this point it is mere speculation that "licensed dealers are passing this fee onto purchasers." ECF No. 5-3 at ¶21. Moreover, even if dealers were passing on their fee obligations to purchasers, it is arguably analogous to passing along other expenses dealers incur as a component of the cost of goods sold.

Second, even assuming the background check fee were actually imposed on purchasers directly, there is no legal impediment to do so. Citing an inapposite 1966 case about voting rights

in the south, Plaintiffs ignore the Supreme Court's reasoning that, unlike other licensing regimes the State's interest in voting is "limited to the power to fix qualifications" and one's ability to pay a fee "is not germane to one's ability to participate intelligently in the electoral process." *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 668 (1966). In the context of the Second Amendment, however, "imposing fees on the exercise of constitutional rights is permissible when the fees are designed to defray (and do not exceed) the administrative costs of regulating the protected activity." *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013). In *Kwong*, the Second Circuit upheld a gun license renewal fee in the amount of $340. *Bruen* did not alter this settled principle, only cautioning that "exorbitant fees deny ordinary citizens their right to public carry" may be constitutionally challenged on a case-by-case basis. *Bruen*, 142 S. Ct. at 2138 n.9. Here, the $2.50 fee associated with the ammunition background check is directly tied to the related administrative costs and is far from the $340 renewal fee approved by the Second Circuit. A gunowner would need to purchase ammunition on a weekly basis for more than two and a half years to reach the same fee amount. At this juncture, the record is not sufficiently developed to reach the conclusion that Plaintiffs desire.

Moreover, that the background check system was inoperative at the time that Dorr sought to purchase his ammunition is also unavailing. Technical glitches cannot serve to undermine constitutionally permissible regulatory regimes. While the Court recognizes, as the *Bruen* court did, that "any permitting scheme can be put toward abusive ends," as where "lengthy wait times in processing license applications . . . deny ordinary citizens their right" to ammunition. *Bruen*, 142 S. Ct. at 2138 n.9, the record is not sufficiently developed to reach the conclusion Dorr desires. There is no allegation of bad faith on the part of the State, and Dorr has not alleged that the system

has been down for any excessively lengthy period of time that would warrant the Court's intervention.

Accordingly, Plaintiffs have not established a likelihood of success on the merits nor an irreparable harm. Because those are sufficient grounds for denying Plaintiff's motion for a TRO, the Court does not address whether a TRO would be in the public interest.

## CONCLUSION

For these reasons, Plaintiffs' request for a TRO against Defendant pending further proceedings on their motion for a preliminary injunction is DENIED. The Court orders the briefing schedule on the preliminary injunction motion against Defendant as follows:

- By 5:00 P.M. on September 22, 2023, Plaintiffs shall serve a copy of this Decision & Order on Defendant and file an affidavit of service confirming such.

- By 5:00 P.M. on October 13, 2023, Defendant shall file its response to Plaintiffs' motion for a preliminary injunction.

- By 5:00 P.M. on October 27, 2023, Plaintiffs may file a reply.

- The Court reserves the right to schedule oral argument should it determine the need exists.

IT IS SO ORDERED.

Dated: September 21, 2023
    Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York