UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

NEW YORK STATE FIREARMS ASSOCIATION,
GEORGE BORRELLO, DAVID DIPIETRO,
WILLIAM ORTMAN, and AARON DORR,

<em>Plaintiffs</em>,

-against-                                          No. 23-CV-6524 (FPG)

DOMINICK L. CHIUMENTO, in his official capacity as
Acting Superintendent of the New York State Police,

<em>Defendant</em>.
-------------------------------------------------------------------X

## SUPERINTENDENT CHIUMENTO'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General
State of New York
144 Exchange Blvd., Suite 200
Rochester, New York 14614
*Attorney for Superintendent Chiumento*

Matthew D. Brown
Heather L. McKay
James M. Thompson
Of Counsel

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ................................................................................... 3

    The CCIA and Its Background Check Provisions .................................... 3

    Recent Data From The Background Check System ................................. 5

STANDARD OF REVIEW ................................................................................. 6

ARGUMENT .................................................................................................... 7

    I.    THE MOTION SHOULD BE DENIED DUE TO JURISDICTIONAL DEFECTS .. 7

        A.    The Court Lacks Jurisdiction Over Defendants Because Plaintiffs Failed to Serve Them. .......................................................... 7

        B.    The Organizational Plaintiff Lacks Standing Because It Has Suffered No Cognizable Injury ..................................................... 8

        C.    The Individual Plaintiffs Lack Standing to Challenge the Background Check Process. ........................................................... 9

    II.    PLAINTIFFS HAVE NOT SHOWN A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS ...................................................................... 12

        A.    Plaintiffs Can Bring Only A Disfavored Facial Challenge ..................... 12

        B.    Plaintiffs Have Not Carried Their Burden to Show That the Challenged Laws Implicate the Second Amendment ................................. 13

            1.    Background Checks and Nominal Fees Are Not "Infringements" 14

            2.    The Supreme Court Has Repeatedly Stated That "Laws Imposing Conditions And Qualifications On The Commercial Sale of Arms" Are "Presumptively Lawful" ............................................. 17

        C.    Background Checks In Connection With The Purchase of Ammunition Are Consistent With American Law And History .................................... 19

            1.    The Supreme Court Has Recognized the Constitutionality of Background Checks ...................................................................... 19

            2.    American Law And History Support Background Checks In Connection With Ammunition Purchases ..................................... 21

D.     The Nominal Fees Supporting the Background Check System Are Constitutional ........................................................................... 25

       1.     The Law Governing Fees In Connection With Constitutional Rights ................................................................................. 25

       2.     History Supports Appropriate Fees In Connection With Purchasing Ammunition ................................................. 29

             a)     American history and tradition include the direct taxation of firearms and ammunition. .............................. 29

             b)     History provides many analogues for ammunition-related regulatory fees ................................................ 31

E.     Plaintiffs' Factual Assertions Are Unsupported And Contradicted By NYSP's Data ................................................................. 32

III.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM ........... 33

IV.    THE EQUITIES AND PUBLIC INTEREST SUPPORT THE CONTINUED IMPLEMENTATION OF THE BACKGROUND CHECK SYSTEM ................... 35

CONCLUSION ....................................................................................... 36

# TABLE OF AUTHORITIES

## Cases

Able v. United States, 44 F.3d 128 (2d Cir. 1995) ........................................................ 7

B&L Productions, Inc. v. Newsom, No. 21-cv-1718, 2023 WL 3443280
  (S.D. Cal. Mar. 14, 2023)........................................................................... 17

Bimber's Delwood, Inc. v. James, 496 F. Supp. 3d 760 (W.D.N.Y. 2020)............................. 6, 33

Brooklyn Brands LLC v. Lieberman, No. 18 Civ. 7245, 2018 WL 10246003
  (E.D.N.Y. Dec. 23, 2018) ........................................................................ 34

Community Housing Improvement Program v. City of New York, 59 F.4th 540
  (2d Cir. 2023)............................................................................... 12, 13

Connecticut Citizens Defense League Inc. v. Lamont, 6 F.4th 439 (2021).................................. 8

Cornetta v. Town of Highlands, 434 F. Supp. 3d 171 (S.D.N.Y. 2020)....................................... 11

Cox v. New Hampshire, 312 U.S. 569 (1941) ............................................................. 26

CRP/Extell Parcel I, L.P. v. Cuomo, 394 F. App'x 779 (2d Cir. 2010) ........................................ 35

Defense Distributed v. Bonta, No. CV 22-6200, 2022 WL 15524977
  (C.D. Cal. Oct. 21, 2022)........................................................................... 14

Dickerson v. Napolitano, 604 F.3d 732 (2d Cir. 2010) .................................................... 13

District of Columbia v. Heller, 554 U.S. 570 (2008).............................................. passim

Doe No. 1 v. Putnam Cnty., 344 F. Supp. 3d 518 (S.D.N.Y. 2018)............................................ 10

Doe v. Bonta, No. 22-cv-10, 2023 WL 187574 (S.D. Cal. Jan. 12, 2023) ................................... 20

Draper v. Healey, 98 F. Supp. 3d 77 (D. Mass. 2015).................................................... 18

Faber v. Metropolitan Life Ins. Co., 648 F.3d 98 (2d Cir. 2011) ..................................... 9

Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123 (1992) ......................................... 26

Fuller v. Oregon, 417 U.S. 40 (1974) ................................................................... 27

Gazzola v. Hochul, 645 F. Supp. 3d 37 (N.D.N.Y. 2022) .................................................. 18

Giambalvo v. Suffolk County, No. 22 Civ. 4778, 2023 WL 2050803
   (E.D.N.Y. Feb. 14, 2023) ........................................................................... 10

Gideon v. Wainwright, 372 U.S. 335 (1963) ............................................... 26

Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 6 (2d Cir. 2007) .................................... 34

Hanson v. New York, No. 06 Civ. 6287L, 2006 WL 3063475 (W.D.N.Y. Oct. 26, 2006) .......... 8

Jackson-Bey v. Hanslmaier, 115 F.3d 1091 (2d Cir. 1997) ......................................... 10

Jacoby & Meyers, LLP v. Presiding Justices, 852 F.3d 178 (2d Cir. 2017) ................................ 13

Kanter v. Barr, 919 F.3d 437 (7th Cir. 2019) .............................................. 23

Kelly v. New York, No. 19 Civ. 2063, 2020 WL 7042764, (E.D.N.Y. Nov. 30, 2020) ............. 27

Kennedy v. Bermerton Sch. Dist., 142 S.Ct. 2407 (2022) .............................................. 14

Kiryas Joel Alliance v. Village of Kiryas Joel, 495 F. App'x 183 (2d Cir. 2012) ........................ 9

Koons v. Platkin, Civ. No. 22-7464, 2023 WL 3478604, at *32-33 (D.N.J. May 16, 2023) ....... 28

Kwong v. Bloomberg, 723 F.3d 160 (2d Cir. 2013) ............................................ passim

Libertarian Party of Erie Cnty. v. Cuomo, 970 F.3d 106 (2d Cir. 2020) ..................................... 10

Libertarian Party of Erie Cty. v. Cuomo, 300 F. Supp. 3d 424 (W.D.N.Y. 2018) ...................... 13

Lujan v. Defs. of Wildlife, 504 U.S. 5550 (1992) ........................................ 11

McDonald v. City of Chicago, 561 U.S. 742 (2010) ....................................... 17

McGregor v. Suffolk County, No. 23-cv-1130, 2023 WL 6521622 (E.D.N.Y. Sept. 7, 2023).... 34

McRorey v. Garland, No. 23-cv-47, 2023 WL 5200670 (N.D. Tex. Aug. 14, 2023) ................ 20

Mississippi Publishing Corp. v. Murphree, 326 U.S. 438 (1946) ................................... 8

Monserrate v. New York State Senate, 599 F.3d 148 (2d Cir. 2010) ........................... 6

Montana Shooting Sports Ass'n v. Holder, No. CV-09-147,
   2010 WL 3926029 (D. Mont. Aug. 31, 2010) ....................................... 18

Murphy Bros. v. Michetti Pipe Stringing, 526 U.S. 344 (1999) ................................. 8

Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose, No. 22-cv-501, 2023 WL 4552284
    (N.D. Cal. July 13, 2023) ........................................................................................... 28

Nat'l Association for Gun Rights, Inc. v. City of San Jose, 632 F. Supp. 3d 1088
    (N.D. Cal. 2022) ......................................................................................................... 28

Nken v. Holder, 556 U.S. 418 (2009) .......................................................................... 35

NYSRPA v. Bruen 142 S. Ct. 2111 (2022) ............................................................. passim

O'Connell v. Gross, Civ. No. 19-11654, 2020 WL 1821832 (D. Mass. Apr. 10, 2020) ............. 28

Occhipinti v. Annucci, No. 19-cv-6651, 2022 WL 1152842 (W.D.N.Y. Apr. 19, 2022) ........... 34

Ocean State Tactical, LLC v. Rhode Island, 646 F. Supp. 3d 368 (D.R.I. 2022) ........................ 14

Or. Firearms Fed'n, Inc. v. Brown, 644 F. Supp. 3d 782 (D. Or. 2022) ...................................... 14

Oregon Firearms Fed. v. Brown, 644 F. Supp. 3d 782 (D. Or. 2022) ......................................... 21

Ortwein v. Schwab, 410 U.S. 656 (1973) .................................................................................... 26

People ex rel. Schneiderman v. Actavis PLLC, 787 F.3d 638 (2d Cir. 2015) ................................ 6

Porter v. State, 58 Ala. 66 (1877) ................................................................................................ 30

Regan v. Vill. of Pelham, No. 19 CIV. 7987 (NSR), 2021 WL 1063320
    (S.D.N.Y. Mar. 19, 2021) .............................................................................................. 8

Restaurant Law Ctr. v. City of N.Y., 360 F. Supp. 3d 192 (S.D.N.Y. 2019) .............................. 13

Sartor v. Toussaint, 70 F. App'x 11 (2d Cir. 2002) ..................................................................... 8

Selevan v. N.Y. Thruway Auth., 711 F.3d 253 (2d Cir. 2013) ..................................................... 27

Shain v. Ellison, 356 F.3d 211 (2d Cir. 2004) ............................................................................ 10

Shum v. JILI Inc., No. 17-cv-7600, 2022 WL 17403608 (E.D.N.Y. Dec. 2, 2022) .................. 7, 8

United States v. Cox, 235 F. Supp. 3d 1221 (D. Kan. 2017) ....................................................... 18

United States v. Craft, No. 23 Cr. 178, 2023 WL 6215326 (S.D.N.Y. Sept. 25, 2023) .............. 27

United States v. Decastro, 682 F.3d 160 (2d Cir. 2012) ......................................................... 10, 16

United States v. Holton, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022) ..................................... 19

United States v. King, No. 22-cr-215, 2023 WL 4873648 (E.D. Pa. July 31, 2023)................... 18

United States v. Libertad, No. 22 Cr. 644, 2023 WL 4378863
   (S.D.N.Y. July 7, 2023) ................................................................................................. 2, 16, 17

United States v. Reilly, No. CR-23-85, 2023 WL 5352296 (E.D. Ok. Aug. 21, 2023) ............... 20

United States v. Saleem, No. 21-cr-86, 2023 WL 2334417 (W.D.N.C. Mar. 2, 2023)............... 28

United States v. Salerno, 481 U.S. 739 (1987) ........................................................................... 12

United States v. Siddoway, No. 21-cr-205, 2022 WL 4482739 (D. Idaho, Sept. 27, 2022) ........ 14

United States v. Sternquist, No. 22-cr-473, 2023 WL 6066076 (E.D.N.Y. Sept. 15, 2023) ........ 19

United States v. Young, 639 F. Supp. 3d 515 (W.D. Pa. 2022) ............................................. 23, 25

United States v. White, No. 23-CR-140, 2023 WL 6066201 (S.D.N.Y. Sept. 18, 2023)....... 21, 25

Vincent v. Garland, No. 21-4121, 2023 WL 5988299 (10th Cir. Sept. 15, 2023)....................... 20

Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc., 149 F. Supp. 3d 376 (E.D.N.Y. 2016)...... 34

Vitagliano v. Cnty. of Westchester, 71 F.4th 130 (2d Cir. 2023) ................................................. 12

Vt. Right to Life Cmte. v. Sorrell, 758 F.3d 118 (2d Cir. 2014) .................................................. 13

Warth v. Seldin, 422 U.S. 490 (1975).......................................................................................... 10

Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442 (2008) .............................. 13

Williams v. Annucci, 895 F.3d 180, 187 (2d Cir. 2018) ............................................................... 1

Williams v. McFadden, No. 22-cv-630, 2023 WL 4919691 (W.D.N.C. Aug. 1, 2023) ........ 21, 28

Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7 (2008) ............................................................ 7

Zablocki v. Redhail, 434 U.S. 374 (1978) ................................................................................... 27

**Statutes**

28 U.S.C. § 1914(a) ..................................................................................................................... 26

N.Y. CPLR § 307(2) ...................................................................................................................... 8

N.Y. Penal Law § 265.00 ................................................................................................ 12, 18

N.Y. Penal Law § 400.02 ...................................................................................................... 3

N.Y. Penal Law § 400.03 ..................................................................................................... 18

N.Y. State Fin. Law § 99-pp ................................................................................................. 5

Defendant Dominick L. Chiumento,[1] sued in his official capacity as Acting Superintendent of the New York State Police ("Superintendent Chiumento" or the "Superintendent"), respectfully submits this memorandum of law, along with the Declarations of Dominick L. Chiumento, Michael W. Deyo, and James M. Thompson, with the accompanying exhibits, in opposition to the motion for a preliminary injunction, ECF No. 5, filed by Plaintiffs New York State Firearms Association ("NYSFA"), George Borrello, David DiPietro, William Ortman, and Aaron Dorr (collectively, "Plaintiffs").

## PRELIMINARY STATEMENT

The straightforward public safety laws that Plaintiffs are challenging – a background check for the purchase of ammunition and a $2.50 fee for that check – simply do not infringe the right to bear arms.  Plaintiffs cannot establish a clear likelihood of success against laws imposing such a negligible burden or such a nominal fee.

As a threshold matter, the Court lacks both personal and subject-matter jurisdiction. There is no personal jurisdiction because Plaintiffs have never served the Superintendent with the summons and complaint, and no subject-matter jurisdiction because Plaintiffs lack standing to challenge the underlying laws.  NYSFA, the organizational plaintiff, has demonstrated no injury in its own right, and decades of Second Circuit precedent prevent it from vicariously raising the rights of its members.  The individual Plaintiffs, meanwhile, can show no harm from the background check law, as each has passed background checks in the past and would presumably do so again.  And Plaintiffs' invocation of a hypothetical ammunition sale they would like to conduct between them (but choose not to) is unavailing because they cannot show

---

[1] The previous Acting Superintendent, Steven A. Nigelli, retired from government service effective October 5, 2023. Because this suit was brought against Superintendent Nigrelli in his official capacity, his successor Superintendent Chiumento is "automatically substituted" as a party. See Fed. R. Civ. P 25(d); Williams v. Annucci, 895 F.3d 180, 187 (2d Cir. 2018).

1

their intended conduct is proscribed by the challenged law or that there is a credible threat of prosecution.

The challenge to the ammunition background check also fails on the merits.  Plaintiffs bring this action as a disfavored facial challenge and have not carried their burden at Step One of the Supreme Court's Bruen test, which involves demonstrating that the Second Amendment's text covers their conduct in the first place.  Even if ammunition were considered an "arm," Plaintiffs cannot establish that the negligible burden of a background check and a $2.50 fee is sufficient to constitute an "infringement."  The original public meaning of the term at the time of the founding referred only to a significant breach or violation, and the laws at issue impose nominal burdens that, at most, "incidentally, minimally, or not substantially burden the exercise of a right without being considered to actually 'infringe' it," United States v. Libertad, No. 22 Cr. 644, 2023 WL 4378863, at *3 (S.D.N.Y. July 7, 2023); see also Bruen, 142 S.Ct. 2111, 2138 n.9 (2022) (contemplating constitutional challenges only if "*exorbitant* fees deny ordinary citizens the right to public carry." (emphasis added)).  The background check and $2.50 fee (payable by a dealer, not a purchaser) is also constitutional as a condition or qualification on the commercial sale of arms, a category of law that the Supreme Court has repeatedly recognized as "presumptively lawful."

The ammunition background check law and the associated fee are both facially constitutional.  Bruen itself noted that state firearms laws "often require applicants to undergo a background check," id., and recognized their constitutionality without conducting a historical analysis.  But a trip through American history reveals a host of laws in which colonial and Founding-era Americans took measures to prevent dangerous persons or groups from obtaining ammunition.  The $2.50 charge for dealers conducting background checks is manifestly

constitutional under the Supreme Court's "fee jurisprudence," as it "is designed to defray (and does not exceed) the administrative costs" connected with its public safety purpose.  Kwong v. Bloomberg, 723 F.3d 160, 166 (2d Cir. 2013).  And American history demonstrates that our forefathers understood that direct taxation of firearms and ammunition was constitutional, far beyond nominal regulatory fees like the one at issue here.

The motion also fails for lack of irreparable harm.  Plaintiffs' unilateral decision to wait over a year since the law was enacted to file their case negates any entitlement to preliminary relief, and they have not established that irreparable harm is likely or even possible: the individual plaintiffs will suffer no harm from a background check they would almost certainly pass, and a $2.50 fee (besides being *de minimis*) amounts to money damages, which cannot constitute irreparable harm as a matter of law.  The balance of the equities and the public interest strongly favor allowing the ammunition background check system to do its job, as the program has prevented between 161 and 373 illegal transactions in just over three weeks, while allowing over 98% of transactions to proceed, demonstrating that it is no barrier to lawful gun owners obtaining ammunition.  Because Plaintiffs have not shown (and cannot show) any infringement of their right to bear arms, the preliminary injunction should be denied.

## STATEMENT OF FACTS

The CCIA and Its Background Check Provisions

On July 1, 2022, the New York State Legislature passed the "Concealed Carry Improvement Act" ("CCIA"). (Declaration of Dominick L. Chiumento, dated October 12, 2023, ¶ 3) Under the CCIA, the Division of State Police ("NYSP") must establish "a statewide license and record database specific for ammunition sales," containing transaction information generated by licensed sellers. Chiumento Dec., ¶¶ 4, 9; see N.Y. Penal Law §400.02(2); N.Y. Executive Law § 228.  Information that must be kept includes the time of the transaction, the date, name,

age, occupation, and residence of the purchaser, and the amount, caliber, manufacturer's name, and serial number on such ammunition.  Id. ¶ 5.  Beginning September 13, 2023, a background check is required with every ammunition purchase, with the check conducted by the NYSP. Id. ¶ 6.  The background check system is supported by a fee paid by dealers, see N.Y. Executive Law §228(5)(a), which is $2.50 for background checks with an ammunition purchase.  Id. ¶¶ 8, 16.

The NYSP implemented a background check system to use for both firearm purchases, which involve querying the federal National Instant Criminal Background Check System ("NICS"), and for ammunition purchases, which do not.  Id. ¶26.  For firearm purchases, New York is one of twenty "point of contact states" in which "a state or local law enforcement agency serv[es] as an intermediary between an FFL[2] and the federal databases checked by the NICS." 28 C.F.R. § 25.2.  In a point of contact state, the law enforcement agency "will receive NICS background check requests from FFLs, check state or local record systems, perform NICS inquiries, determine whether matching records provide information demonstrating that an individual is disqualified from possessing a firearm under Federal or state law, and respond to FFLs with the results of a NICS background check."  Id.; see generally 18 U.S.C. § 922(t) (laying out the federal-law background check requirements for firearm purchases); Chiumento Dec. ¶¶ 25-31.

The New York State system for ammunition background checks operates independently of the NICS database.  When an ammunition sale is made, a dealer contacts NYSP directly. Id., ¶ 26. NYSP then performs searches against New York State data sources to determine if the purchase is subject to any federal or state disqualifier.  Id. ¶ 29.  If no potentially disqualifying New York State records are identified, the transaction is approved and a "proceed" response is

---

[2] FFL stands for "Federal Firearms Licensee," a certified gun store or other dealer in firearms.

transmitted to the dealer or seller.  Id.  If any potentially disqualifying records are identified, the transaction is "delayed," and an examiner employed by the State Police reviews the application by hand.  Id.  The examiner will review the response, conduct any additional research required to determine whether the purchaser can lawfully possess ammunition, and ultimately adjudicate the transaction as either a "proceed" or "deny."[3]  Id.

Building and operating the background check system is a significant undertaking.  To Date, the NYSP has filled approximately 29 full-time positions for examiners and reassigned seven sworn members to the point of contact unit. NYSP also procured space and equipment for the  system.  Id. ¶ 27.  The money collected from background check fees goes to support the background check system, and only the background check system.  (Id. ¶ 7 and 8). Section 99-pp of the New York State Finance Law requires that "all revenues" in connection with background checks are placed in a "background check fund," which may be used only "for the direct costs associated with background checks."  N.Y. State Fin. Law § 99-pp(3).  If the revenue from background checks exceeds the expenses of administering the system, the money "shall remain in the background check fund" and "be used to reduce the amount of the fee."  Id. § 99-pp(5); see generally Chiumento Dec. ¶¶ 27, 45.

Recent Data From The Background Check System

The system for ammunition background checks became operational on September 13, 2023, Chiumento Dec. ¶¶ 15, 20, and has been running operating without issue.  Id. ¶ 32.  From September 13 to October 9, 2023, the State Police processed 29,464 ammunition transactions, of

---

[3] If the individual is denied, he can appeal the decision to the NYSP, which must explain the reason for the denial. N.Y. Executive Law § 228(8); see Chiumento Dec. ¶¶ 42-44.  If the applicant disagrees with the reason, he may appeal to the Attorney General, id.; see Chiumento Dec. ¶ 44, and can subsequently challenge any decision in New York state court by filing a special proceeding under CPLR Article 78.

which 29,037 (or 98.6%) were approved.  Id. ¶ 33-34.  During the same period, only 161

ammunition transactions were denied, 0.55% of all checks, while 231 checks, or 0.78% of the

total, are "delayed" while further human review is performed to determine whether the

prospective purchaser may legally take possession of ammunition. Id. ¶¶ 35-36.  Only 32 people

appealed the denial of their background check, with 19 of those appeals ultimately being

overturned.  Of the eleven appeals upheld, eight were for mental health-related issues, two were

based on state statutory disqualifiers (either a conviction for a "serious offense" under N.Y.

Penal Law § 265.00(17) or an active Extreme Risk Protection Order under CPLR Article 63-A),

and one was for a prior felony conviction.  Id. ¶¶ 37-39.

      Like any database, the background check system may need to be down at times for

scheduled maintenance, unexpected power outages, or other events beyond NYSP's control.

However, there has been no significant downtime since the system went live, as evidenced by the

number of transactions processed.  Id. ¶ 46.

## STANDARD OF REVIEW

      "A preliminary injunction is an extraordinary remedy never awarded as of right."

Monserrate v. New York State Senate, 599 F.3d 148, 154 (2d Cir. 2010). In cases such as this,

where the moving party seeks to enjoin the State from enforcing its own laws, "the party must

demonstrate a clear or substantial likelihood of success on the merits and make a strong showing

of irreparable harm." Bimber's Delwood, Inc. v. James, 496 F. Supp. 3d 760, 771 (W.D.N.Y.

2020) (cleaned up).  This "heightened standard" is also required because the injunction the

Plaintiffs seek is mandatory, altering the status quo rather than maintaining it.  People ex rel.

Schneiderman v. Actavis PLLC, 787 F.3d 638, 650 (2d Cir. 2015).  The higher burden is

appropriate because "governmental policies implemented through legislation or regulations

developed through presumptively reasoned democratic processes are entitled to a higher degree of

deference and should not be enjoined lightly." Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam). The moving party must also demonstrate that the injunction serves the public interest, and courts must "pay particular regard for the public consequences of employing the extraordinary remedy of injunction." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).

## **ARGUMENT**

### I.   **THE MOTION SHOULD BE DENIED DUE TO JURISDICTIONAL DEFECTS**

#### A.   **The Court Lacks Jurisdiction Over Defendants Because Plaintiffs Failed to Serve Them.**

To date, Plaintiffs have not properly served the Superintendent, depriving this Court of jurisdiction.  "The requirements for initial service of a summons and complaint are contained in Federal Rule of Civil Procedure 4." Shum v. JILI Inc., No. 17-cv-7600, 2022 WL 17403608, at *2 (E.D.N.Y. Dec. 2, 2022).  According to Rule 4(j)(2),

> A state, a municipal corporation, or any other state-created governmental organization that is subject to suit must be served by:
>
> (A) delivering a copy of the summons and of the complaint to its chief executive officer; or
>
> (B) serving a copy of each in the manner prescribed by that state's law for serving a summons or like process on such a defendant.

Fed. R. Civ. P. 4(j)(2); see CPLR 307(2) (requirements for service on a state officer or agency).

On September 13, 2023, Plaintiffs filed their initial complaint in this action, and the summons was issued.  See ECF No. 1 & 2.  Two days later, Plaintiffs filed an amended complaint (the "AC"), a motion for a temporary restraining order and preliminary injunction, and a motion to expedite. See Docket Nos. 4, 5, & 6.  To date, the summons and complaint have not been served on the Superintendent. See Declaration of Michael W. Deyo, at ¶ 4.  On September 21, 2023, the Court issued a Decision and Order denying the TRO and setting a briefing schedule for the preliminary injunction.  See ECF No. 9 (the "September 21 Opinion").  The Court

ordered Plaintiffs to serve a copy of the September 21 Opinion on the Superintendent by 5:00

p.m. on September 22, 2023, which Plaintiffs then did via hand delivery.  See ECF No. 11.

The September 21 Opinion was the only document Plaintiffs ever served.  See Deyo

Decl. ¶ 7. In particular, the Superintendent has never been served with the summons and

complaint in this action, Id., depriving the Court of personal jurisdiction. "[S]ervice of the

summons is the procedure by which a court . . . asserts jurisdiction over the person of the party to

be served." Shum, 2022 WL at * 2, quoting Mississippi Publishing Corp. v. Murphree, 326 U.S.

438, 444–45 (1946); see Murphy Bros. v. Michetti Pipe Stringing, 526 U.S. 344, 350 (1999).

Plaintiffs sending certain papers (not including the summons) via email is ineffective under Rule

4.[4]  Similarly, that Plaintiffs filed an affidavit of service on the Attorney General cannot provide

jurisdiction over the Superintendent – the only State defendant actually being sued.  See CPLR §

307(2); see, e.g., Hanson v. New York, No. 06 Civ. 6287L, 2006 WL 3063475, at *2 (W.D.N.Y.

Oct. 26, 2006) ("service on the Attorney General is insufficient to confer personal jurisdiction

over the State in a case against one of its agencies or subdivisions").  Accordingly, Plaintiffs'

preliminary injunction motion should be dismissed for want of personal jurisdiction.

### B.    The Organizational Plaintiff Lacks Standing Because It Has Suffered No Cognizable Injury

The NYSFA lacks standing because it cannot bring suit on behalf of its members, and

because it can demonstrate no injury in its own right.  The analysis is governed by the Second

Circuit's recent decision in Connecticut Citizens Defense League Inc. v. Lamont, 6 F.4th 439

(2021).  CCDL, like this action, was a case brought a gun advocacy group attempting to

challenge a state measure on Second Amendment grounds.  Id. at 441.  The Second Circuit

---

[4] Defendants' knowledge of this action is of no moment.  "Actual notice cannot 'cure a failure to comply with the statutory requirements for serving process.'" Regan v. Vill. of Pelham, No. 19 CIV. 7987 (NSR), 2021 WL 1063320, at *5 (S.D.N.Y. Mar. 19, 2021) (quoting Sartor v. Toussaint, 70 F. App'x 11, 13 (2d Cir. 2002)).

reversed and vacated a preliminary injunction on standing grounds, noting its longstanding

doctrine that an organization "lack[s] 'standing to assert the rights of its members," and could

only bring "suit on its *own* behalf" if it could show that the organization itself suffered an "actual

or threatened injury in fact." Id. at 447 (emphasis in the original); see also Kiryas Joel Alliance

v. Village of Kiryas Joel, 495 F. App'x 183, 189 (2d Cir. 2012) (summary order) (explaining that

"the rights § 1983 secures are personal to those purportedly injured," and therefore

"organizations lack standing to assert § 1983 claims on behalf of their members."). Here, the

Amended Complaint clarifies that NYSFA is suing derivatively on behalf of its members, see

AC ¶ 27 ("NYSFA sues on their behalf").  NYSFA has not alleged (let alone demonstrated) any

injury to itself, and therefore has no standing to sue.

> **C.      The Individual Plaintiffs Lack Standing to Challenge the Background Check Process.**

This Court also lacks jurisdiction over Plaintiffs' claims because the individual Plaintiffs

do not have standing to assert them.  "Standing is a jurisdictional prerequisite; accordingly, the

Court must initially determine whether [the plaintiff] has standing to invoke the jurisdiction of

the federal courts to determine the merits of the underlying disputes." Kwong v. Bloomberg, 876

F. Supp. 2d 246, 251 (S.D.N.Y. 2012), *aff'd* 723 F.3d 160 (2d Cir. 2013).  "The three elements

comprising Article III standing are well-established: a plaintiff must show (1) an 'injury in

fact'—an invasion of a legally protected interest that is (a) concrete and particularized, and (b)

actual or imminent, not conjectural or hypothetical; (2) a causal connection between the

plaintiff's injury and the challenged conduct; and (3) that it is likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision." Faber v. Metropolitan Life

Ins. Co., 648 F.3d 98, 102 (2d Cir. 2011).

The Plaintiffs must establish standing for each cause of action at each stage of the case,

and past injury alone will not suffice in a case like this one where they seek prospective injunctive relief.  Warth v. Seldin, 422 U.S. 490, 498 (1975); Shain v. Ellison, 356 F.3d 211, 215 (2d Cir. 2004).  Plaintiffs typically lack standing to challenge New York State's firearm laws when they fail to engage in the process set forth in those laws.  See Doe No. 1 v. Putnam Cnty., 344 F. Supp. 3d 518, 530–31 (S.D.N.Y. 2018).  Under settled Second Circuit precedent, "to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy."  United States v. Decastro, 682 F.3d 160, 164 (2d Cir. 2012) (quoting Jackson-Bey v. Hanslmaier, 115 F.3d 1091, 1096 (2d Cir. 1997)).  Here, no Plaintiff claims to have gone through a background check for the purchase of ammunition.  The exception to this general rule—where an application "would have been futile," see id., has not been invoked. Plaintiffs do not allege that they would have failed the background check; to the contrary, they note having previously passed background checks to purchase firearms.  See AC ¶¶ 22-25.  That fact underscores the lack of a genuine case or controversy here – if the Plaintiffs went through a background check, there is every reason to believe they would pass.  Although Plaintiffs might dislike going through even a successful background check process, "[m]ere objection or antipathy to the law does not constitute a showing of futility."  Giambalvo v. Suffolk County, No. 22 Civ. 4778, 2023 WL 2050803, at *5 (E.D.N.Y. Feb. 14, 2023) (quoting Libertarian Party of Erie Cnty. v. Cuomo, 970 F.3d 106, 116 (2d Cir. 2020)).

This Court likewise lacks jurisdiction over Plaintiffs' challenge to the background check fee.  Cf. Kwong v. Bloomberg, 723 F.3d 160, 162 n.4 (2d Cir. 2013) (plaintiffs had standing to challenge a firearms licensing fee only when they had paid it).  No Plaintiff claims to have paid the $2.50 fee, which is nominal or de minimis in any event.

Plaintiff Dorr's claim that he could not purchase ammunition for his Glock 19 based on a

"failure of statewide license and record database," ECF No. 4 at ⁋ 25, is also unavailing, as he fails to establish the requisite causal connection.  The claimed injury has to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 (1992) (cleaned up). His evidence for the purported inability to buy ammunition is a sign in Runnings saying, "Sales Closed till Staff are trained on new software," ECF No. 4-1 at 3, and a purported sign at Wal-Mart stating "E-NICS is down no guns or ammo sorry." <u>Id.</u> at 4.  But Plaintiffs have not explained how Runnings' alleged decision not to sell ammunition while training staff on "new software," and Walmart's alleged difficulty accessing the federal National Instant Criminal Background Check System ("NICS"), on the single day that Dorr tried to make a purchase, is fairly traceable to Superintendent Chiumento, rather than those third parties.  <u>See generally</u> <u>Cornetta v. Town of Highlands</u>, 434 F. Supp. 3d 171, 183 (S.D.N.Y. 2020).  And their contention that the license and record database is offline is contradicted by the tens of thousands of ammunition background checks the NYSP has conducted without incident.  <u>See</u> Chiumento Dec. ¶¶ 33-39.

The only arguably cognizable injury pertains to DiPietro's stated intention to sell "100 rounds of spare ammunition" to Plaintiff Ortman "for the price of $8.00." ECF No. 4 at ⁋ 26. DiPietro alleges that he could be subject to a fine of up to $1,000 for making the sale without involving a licensed dealer in firearms or registered seller of ammunition, or registering as a seller of ammunition.  ECF No. 4 at ¶ 26.  However, DiPietro has not plausibly alleged (let alone demonstrated sufficiently for the purposes of his preliminary injunction motion) that he would be a person subject to the challenged statute, which applies only to a "seller of ammunition," defined as someone "who engages in the *business* of purchasing, selling or keeping

ammunition."  N.Y. Penal Law §§ 265.00(24); 400.03 (emphasis added); see Vitagliano v. Cnty. of Westchester, 71 F.4th 130, 136 (2d Cir. 2023) (noting that standing for pre-enforcement challenge requires showing that plaintiff's conduct is "arguably affected with a constitutional interest" and is "proscribed by" the challenged law and that "there exists a credible threat of prosecution thereunder").  For all these reasons, Plaintiffs lack standing, no live controversy exists between the parties, and the Court lacks subject-matter jurisdiction.

## II.   PLAINTIFFS HAVE NOT SHOWN A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS

Even if personal and subject-matter jurisdiction were proper, Plaintiffs have not established any potential success on the merits, let alone the "clear or substantial likelihood of success" required of a party seeking a mandatory injunction.  Actavis, 787 F.3d at 650.  Under well-established Supreme Court and Second Circuit precedent, including the recent ruling in NYSRPA v. Bruen, 142 S.Ct. 2111 (2022), the ammunition background check and the accompanying $2.50 fee comfortably pass constitutional muster.

### A.   Plaintiffs Can Bring Only A Disfavored Facial Challenge

Because the Plaintiffs are making a facial challenge to the background check law and the accompanying $2.50 fee, they "must establish that no set of circumstances exist under which the Act would be valid."  United States v. Salerno, 481 U.S. 739, 745 (1987); accord Community Housing Improvement Program v. City of New York, 59 F.4th 540, 548 (2d Cir. 2023) (reaffirming Salerno as the governing standard for facial challenges).  Although the Amended Complaint does not specify whether Plaintiffs' challenge is facial or as-applied, the relief sought is clearly facial in nature, as Plaintiffs demand a declaratory judgment that the law is "devoid of any legal force or effect," and "injunctive relief restraining" the Superintendent "from enforcing [the law] with respect to the purchase of ammunition."  See AC at 10; cf. Libertarian Party of Erie Cty. v. Cuomo,

300 F. Supp. 3d 424, 439 (W.D.N.Y. 2018) (Geraci, J.) ("A claim is facial if it challenges application of the law more broadly.  A claim is as-applied if it is limited to a plaintiff's particular case."), aff'd, 970 F.3d 106, 118, 126 (2d Cir. 2020).  And any attempt by Plaintiffs to reframe this case as an as-applied challenge would be unavailing, as a long line of precedent within the Second Circuit establishes that a "pre-enforcement" challenge to a state law, defined as one brought "before [any plaintiffs] have been charged with any violation of law," is properly considered as a facial challenge.  Jacoby & Meyers, LLP v. Presiding Justices, 852 F.3d 178, 184 (2d Cir. 2017); see Restaurant Law Ctr. v. City of N.Y., 360 F. Supp. 3d 192, 208 (S.D.N.Y. 2019) ("Plaintiffs bring their challenge to the [] Law before it has been enforced.  As such, their challenge is a facial challenge.").

Facial challenges to a state statute's constitutionality are "generally disfavored," particularly because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." Dickerson v. Napolitano, 604 F.3d 732, 741-42 (2d Cir. 2010) (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008)).  Accordingly, the burden facing Plaintiffs is severe: "[a] facial [] challenge will succeed only when the challenged law can *never* be validly applied."  Vt. Right to Life Cmte. v. Sorrell, 758 F.3d 118, 128 (2d Cir. 2014) (emphasis added); accord Community Housing, 59 F.4th at 548 ("In other words, the plaintiff must show that the statute is unconstitutional in all of its applications.").

### B.    Plaintiffs Have Not Carried Their Burden to Show That the Challenged Laws Implicate the Second Amendment

Bruen laid out a new two-part test for analyzing Second Amendment claims.  First, the challenging party must establish that "the Second Amendment's plain text covers an individual's conduct."  142 S.Ct. at 2129-30.  If so, then "the Constitution presumptively protects that conduct.

The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." Id.; see United States v. Siddoway, No. 21-cr-205, 2022 WL 4482739, at *2 (D. Idaho, Sept. 27, 2022) ("The first prong of the Bruen test is textual . . . . The second prong is historical"). As federal courts across the country have recognized post-Bruen, the burden of adducing historical evidence does not shift onto the government until the challenger has shown his or her conduct to be constitutionally protected.[5] See Defense Distributed v. Bonta, No. CV 22-6200, 2022 WL 15524977, at *3 (C.D. Cal. Oct. 21, 2022) (collecting cases and noting that "[w]hatever else may be said of Bruen, these parts of the opinion are crystal-clear"); see, e.g., Or. Firearms Fed'n, Inc. v. Brown, 644 F. Supp. 3d 782, 799 (D. Or. 2022) (denying preliminary injunction where movant failed to show that their conduct was covered by the text of the Second Amendment); Ocean State Tactical, LLC v. Rhode Island, 646 F. Supp. 3d 368, 388 (D.R.I. 2022) (same). Here, the Plaintiffs simply have not demonstrated that either the background check or the $2.50 fee on dealers implicates the Second Amendment's text, and therefore have failed to meet their burden under Step One of the Bruen inquiry.

        1.     Background Checks and Nominal Fees Are Not "Infringements"

Even if ammunition did constitute an "arm" within meaning of the Second Amendment's text, the negligible burdens at issue in this case – a background check and a $2.50 fee, which is not even assessed on the buyer – are simply too minimal to constitute an "infringement." Plaintiffs here assert that "[t]heir ability to purchase ammunition is wholly infringed by the background

---

[5] This framework corresponds to that used by the Supreme Court with respect to other constitutional rights, where a movant must first demonstrate that a constitutional right applies to his or her situation before the burden shifts to the government to show that its actions are constitutionally justified. See, e.g., Kennedy v. Bermerton Sch. Dist., 142 S.Ct. 2407, 2421 (2022) ("Under this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of our case law.").

checks and associated fees," Pl. Br. at 1-2, but they simply assume that any regulation that touches

on guns must be an "infringement" – a maximalist interpretation at odds with both the historical

understanding of the term and with binding precedent.

The scope of a constitutional provision is "pegged to the public understanding of the right"

at the time when it was adopted, Bruen, 142 S.Ct. at 2137, and a member of the public at the time

of the founding would have understood the term "infringe" to refer to only a *significant* or *complete*

violation of a right.  To illustrate that understanding, we look to the same sources that the Supreme

Court did in Heller: Samuel Johnson's foundational 1755 Dictionary of the English Language and

Noah Webster's Compendious Dictionary of the English Language, published in 1806 in the

newly-formed United States.  See Heller, 554 U.S. at 581.[6]  Dr. Johnson defined "infringe" as a

significant infraction or complete breach: "to violate; to break laws or contracts" or else "to

destroy; to hinder."  Samuel Johnson, A Dictionary of the English Language (1st edition 1755),

Thompson Declaration ("TD") Ex. 1; see also John Ash, The New and Complete Dictionary of the

English Language, Vol. 1 (1st Ed. 1775), TD Ex. 2 (defining "infringed" as "violated, broken,

destroyed").  The grievousness of an "infringement" stood in contrast to the related term

"abridgement," which was defined as "a diminution in general" or any "restraint, or abridgement

of liberty."  See Johnson, A Dictionary of the English Language, supra, TD Ex. 3; see also id.

(defining "abridge" as "to contract, to diminish, to cut short").  The same distinction appears in

Noah Webster's dictionary, where "abridge" is defined as "to contract, shorten, deprive," while

"infringe" means something much more serious: "to violate, break, transgress."  Noah Webster, A

---

[6] Heller cited to a third dictionary, the New and Complete Law Dictionary written by the English lexicographer
Timothy Cunningham.  See Heller, 554 U.S. at 581.  Cunningham's dictionary does not define "infringe" or
"infringement," but its understanding of "abridge" is consistent with the definition in Johnson and Webster's work.
See Timothy Cunningham, A New and Complete Law Dictionary, vol. 1 (1764), available at
https://books.google.co.ls/books?id=Y580AQAAMAAJ&printsec=frontcover#v=onepage&q&f=false.

Compendious Dictionary of the English Language (1st ed. 1806) at 2, 158, TD Exs. 4 & 5.  The public thus understood an "infringement" to be a full and complete violation of a right, while a smaller or marginal impact on a right would constitute an abridgement only.  Cf. Joseph Blocher & Darrell A.H. Miller, What is Gun Control?  Direct Burdens, Incidental Burdens, and the Boundaries of the Second Amendment, 83 U. Chi. L. Rev. 295, 334-35 (2016) (discussing the textual meaning of the term "infringed" and how the text is not implicated by "incidental burdens").

In keeping with the original public understanding, federal courts in this Circuit both before and after Bruen have recognized that "any number of regulations may incidentally, minimally, or not substantially burden the exercise of a [Second Amendment] right without being considered to actually 'infringe' it." United States v. Libertad, No. 22 Cr. 644, 2023 WL 4378863, at *3 (S.D.N.Y. July 7, 2023).  The leading case in this Circuit is United States v. Decastro, 682 F.3d 160 (2d Cir. 2012), which reviewed both the Supreme Court's Second Amendment case law and its treatment of other rights and concluded that "we do not read [Heller] to mandate that any marginal, incremental or even appreciable restraint on the right to keep and bear arms be subject to heightened [constitutional] scrutiny." Id. at 166.  The Circuit noted that "[r]eserving heightened scrutiny for regulations that burden the Second Amendment right substantially is not inconsistent with the classification of that right as fundamental to our scheme of ordered liberty" because "[a] similar threshold showing is needed to trigger heightened scrutiny of laws alleged to infringe other constitutional rights." Id. at 166-67; see also id. at 167-68 (reviewing Supreme Court case law in which minimal burdens on other rights such as marriage, voting, free speech, and property were held not to trigger full constitutional scrutiny).

Bruen itself supports that conclusion, finding "shall-issue" licensing laws (which typically include background checks) to be constitutional without subjecting them to historical analysis, but noting that the outcome would be different if "lengthy wait times . . . or exorbitant fees deny ordinary citizens the right to public carry."  142 S.Ct. at 2138 n.9; see Libertad, 2023 WL 4378863 at *4 (licensing and analogous laws "do not even trigger a Bruen inquiry into whether they are consistent with this Nation's tradition of firearm regulation . . . because they do not on their face prevent anyone lawfully entitled to do so from keeping and bearing arms."); see, e.g., B&L Productions, Inc. v. Newsom, No. 21-cv-1718, 2023 WL 3443280, at *5 (S.D. Cal. Mar. 14, 2023) (dismissing challenge to law banning ammunition sales at county fair because it does not "impede[] Plaintiffs from acquiring or purchasing firearms or ammunition altogether, amounting to a prohibition of that right.").

Simply put, the background check laws do not impose any appreciable burden on the right to bear arms, let alone one significant enough to constitute an "infringement" as the term was understood at the time of the Founding.  Plaintiffs have not demonstrated otherwise, and so their challenge fails at Bruen Step One.

2.    The Supreme Court Has Repeatedly Stated That "Laws Imposing Conditions And Qualifications On The Commercial Sale of Arms" Are "Presumptively Lawful"

The background check requirement and the associated fee are also constitutional as conditions or qualifications on the commercial sale of arms.   The Supreme Court has repeatedly clarified that restrictions on commercial sale do not infringe the Second Amendment, reiterating that "nothing in our opinion[s] should be taken to cast doubt on…laws imposing conditions and qualifications on the commercial sale of arms," and that such measures are "presumptively lawful." Heller, 554 U.S. at 626-27 & 627 n.26; McDonald v. City of Chicago, 561 U.S. at 786 (quoting the same passage and declaring, "[w]e repeat those assurances here"); see Bruen, 142 S.Ct. at 2162

17

(Kavanaugh, J., joined by Roberts, C.J., concurring) (quoting the passage in full to demonstrate that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations."). Accordingly, federal courts both before and after <u>Bruen</u> have treated laws that merely regulate the trade in guns, rather than possession or use by individuals, as outside the scope of the Second Amendment.  <u>See, e.g.</u>, <u>Gazzola v. Hochul</u>,[7] 645 F. Supp. 3d 37, 64-65 (N.D.N.Y. 2022) (citing this body of law and denying preliminary injunction where "Plaintiffs have not cited any authority supporting a Second Amendment right for an individual or a business organization to engage in the commercial sale of firearms."); <u>United States v. King</u>, No. 22-cr-215, 2023 WL 4873648, at *3 (E.D. Pa. July 31, 2023) ("[T]he Second Amendment's plain text does not cover the commercial sale of firearms.  As a result, there is no need to discuss whether the [challenged] Act is consistent with the Nation's historical tradition of firearm regulation.").[8]

The ammunition background check statute is a "law[] imposing conditions and qualifications on the commercial sale of arms."  <u>Heller</u>, 554 U.S. at 626-27.  It applies only to "sellers of ammunition," <u>see</u> N.Y. Penal Law § 400.03, defined by statute as "any person, firm, partnership, corporation or company who engages in the business of purchasing, selling or keeping ammunition."  N.Y. Penal Law § 265.00(24).  And the law only forbids a seller from *selling* to

---

[7] The statutes challenged in the <u>Gazzola</u> case included the background check law challenged here.  <u>See</u> 645 F. Supp. 3d at 68-69.  Although the direct appeal of the Northern District's order denying a preliminary injunction is still pending, the plaintiffs in that matter filed emergency motions against the ammunition background check in the Second Circuit and multiple emergency applications to the Supreme Court, each of which was rejected.  <u>See, e.g.</u>, 143 S.Ct. 743 (U.S. 2023); 2023 WL 6558369 (U.S. Oct. 10, 2023).

[8] <u>See also, e.g.</u>, <u>Draper v. Healey</u>, 98 F. Supp. 3d 77, 85 (D. Mass. 2015) (challenged law "fits comfortably among the categories of regulation that <u>Heller</u> suggested would be 'presumptively lawful' because it 'imposes conditions and qualifications on the commercial sale of arms.'"); <u>United States v. Cox</u>, 235 F. Supp. 3d 1221, 1227-28 (D. Kan. 2017) (conviction for unregistered dealing "is clearly one of the federal 'laws imposing conditions and qualifications on the commercial sale of arms' that <u>Heller</u> said were permissible under the Second Amendment."); <u>Montana Shooting Sports Ass'n v. Holder</u>, No. CV-09-147, 2010 WL 3926029, at *21 (D. Mont. Aug. 31, 2010) ("<u>Heller</u> said nothing about extending Second Amendment protection to firearm manufacturers or dealers. If anything, <u>Heller</u> recognized that firearms manufacturers and dealers are properly subject to regulation[.]"), <u>R&R adopted</u>, 2010 WL 3909431 (D. Mont. Sept. 29, 2010), <u>aff'd</u>, 727 F.3d 975 (9th Cir. 2013).

persons who fail a background check – the background check requirement does not directly prohibit any private citizen from owning ammunition.[9]  Likewise, as the Court has noted, "the fee provision under CCIA is payable by the dealer, not the purchaser."  September 21 Opinion at 7.

The challenged laws are commercial regulations that discuss when and how a seller may sell ammunition, a category of law the Supreme Court has recognized as outside the scope of the Second Amendment.  Cf. United States v. Holton, 2022 WL 16701935, at *2 (N.D. Tex. Nov. 3, 2022) (laws regulating commercial sale of arms "did not infringe on the rights guaranteed under the Second Amendment.").  The Bruen decision does not undermine the Supreme Court's previous declarations on this subject, particularly when Justice Kavanaugh and Chief Justice Roberts reiterated that such measures are "presumptively lawful," Bruen, 142 S.Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring), and where Justice Alito separately wrote to emphasize that "[o]ur holding decides nothing about…the requirements that must be met to buy a gun." Id. at 2157 (Alito, J., concurring).  See also United States v. Sternquist, No. 22-cr-473, 2023 WL 6066076, at *4 (E.D.N.Y. Sept. 15, 2023) (any view that "would have the Court believe that Bruen deemed one of Heller's 'presumptively lawful' measures to be unconstitutional . . . finds no support in Bruen."

C.   **Background Checks In Connection With The Purchase of Ammunition Are Consistent With American Law And History**

1.   The Supreme Court Has Recognized the Constitutionality of Background Checks

Plaintiffs' challenge to the background check requirement also fails because, as multiple federal courts have recognized, Bruen "approved the constitutionality of regulations requiring criminal background checks."  Vincent v. Garland, No. 21-4121, 2023 WL 5988299, at *3 (10th

---

[9] Though other laws do so, and have been upheld as constitutional post-Bruen, See, e.g., White, 2023 WL 6066201 at *6-7.

Cir. Sept. 15, 2023).  In confirming the constitutionality of "shall-issue" licensing laws, the <u>Bruen</u> majority noted that such laws "often require applicants to undergo a background check" in order "to ensure [] that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens." <u>Bruen</u>, 142 S.Ct. at 2138 n.9.  The majority emphasized that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of such laws, reasoning that "[b]ecause these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry."  <u>Id.</u>  Notably, the Supreme Court affirmed such laws' constitutionality *without* engaging in the historical analysis from <u>Bruen</u> Step Two, instead simply noting that it did not "rule out" as-applied constitutional challenges in the event that "lengthy wait times . . . or exorbitant fees deny ordinary citizens their right to public carry."  <u>Id.</u>  Likewise, Justice Kavanaugh and Chief Justice Roberts emphasized that shall-issue licensing regimes "may require . . . a background check," and that states employing or adopting such laws "may continue to do so."  <u>Id.</u> at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring).

Accordingly, federal courts across the country have found that "[t]he <u>Bruen</u> majority . . . seems to acknowledge the facial constitutionality of regimes requiring background checks and attendant waiting periods to ensure a potential purchaser is not prohibited from exercising Second Amendment rights," <u>McRorey v. Garland</u>, No. 23-cv-47, 2023 WL 5200670, at *4 (N.D. Tex. Aug. 14, 2023), and have sustained such laws without conducting a historical analysis.  <u>See, e.g.,</u> <u>id.</u>; <u>United States v. Reilly</u>, No. CR-23-85, 2023 WL 5352296, at *4 (E.D. Ok. Aug. 21, 2023) ("undergoing a background check" is something "the constitutionality of which the Supreme Court did not call into question."); <u>Doe v. Bonta</u>, No. 22-cv-10, 2023 WL 187574, at *6 (S.D. Cal. Jan. 12, 2023) ("Justice Thomas confirmed that the constitution permits . . . background checks so long

as the requirements don't have the effect of preventing law-abiding citizens from exercising their Second Amendment rights."); see also, e.g., Williams v. McFadden, No. 22-cv-630, 2023 WL 4919691, at *5 (W.D.N.C. Aug. 1, 2023) (background checks are "a proposition which the Supreme Court has repeatedly recognized is consistent with this country's historical tradition."); Oregon Firearms Fed. v. Brown, 644 F. Supp. 3d 782, 806 (D. Or. 2022) (law requiring "a background check" "track[s] squarely with the objective regime outlined in Bruen").

       2.    American Law And History Support Background Checks In Connection With Ammunition Purchases

Even if the Plaintiffs had carried their burden at Bruen Step One, and even if the Supreme Court's repeated endorsement of background checks and conditions on the commercial sale of arms did not apply, background checks pass constitutional muster because American history "offers compelling evidence of a tradition of barring those deemed dangerous from possessing ammunition." United States v. White, No. 23-CR-140, 2023 WL 6066201, at *6 (S.D.N.Y. Sept. 18, 2023). Under Bruen, the government must adduce one or more historical analogues to show that a measure is "consistent with this Nation's historical tradition of firearm regulation." 142 S.Ct. at 2126, 2132-33. "[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." Id. at 2133. To pass constitutional muster, a historical analogue need only be "relevantly similar" to the challenged law – "a well-established and representative historical *analogue*, not a historical *twin*." Id. at 2132, 2133 (emphasis in the original); see also id. (a historical analogue need not be a "dead ringer" to establish constitutionality). Plaintiffs in this case have declined to conduct any historical analysis as part of their case-in-chief or to adduce any historical sources of their own in connection with their preliminary injunction motion. See generally ECF No. 5; see also ECF No. 5-2 (identifying no history-related witnesses or exhibits). The history discussed below is uncontradicted.

The practice of checking the backgrounds of persons seeking to buy ammunition is well-supported by analogous historical laws, including:

**_Bars on Ammunition Sales To Outsiders, Foreign Powers, or Native Americans._** Colonial Americans understood the danger of ammunition being sold to dangerous persons, and enacted laws prohibiting the sale of gunpowder or bullets to outsiders, or to groups they perceived as threatening.  New York in 1664 enacted a law declaring that "[n]o person shall sell, give or Barter directly or indirectly any Gun or Guns, Powder, Bullett, shott, [or] lead . . . Without Licence[10] first had and obtained under the Governours hand and Seal, to any Indian whatsoever, nor to any person Inhabiting out of this Government."  1 Commissioners of Statutory Revision. Colonial Laws of New York from the Year 1664 to the Revolution 40-41 (1894), TD Ex. 7. Pennsylvania adopted a nearly-identical law the same year, also covering "Powder, Bullet, shott [or] Lead," and also prohibiting sales to Native Americans or "any person Inhabitting out of this Government," without the Governor's direct authorization.  George Staughton, et al., Charter to William Penn, and Laws of the Province of Pennsylvania, Passed between the Years 1682 & 1700 32 (1879), TD Ex. 8; see also J. Hammond Trumbull, The Public Records of the Colony of Connecticut 79 (1850), TD Ex. 9 (similar Connecticut law prohibiting sales of "gunpowder, or shott, or lead, or mould" or "arrowe heads" to any Native American or outsider, "without lycence of this or the prticuler Court, or som two Magistrats").  These laws were patterned after an earlier Massachusetts statute that prohibited ammunition sales to natives or outsiders (but did not allow the Governor to make exceptions).  See Edward Rawson, et al., The General Laws and Liberties

---

[10] "License" as used in the colonial era referred to "a grant of permission," rather than a document.  See Samuel Johnson, A Dictionary of the English Language (1st edition 1755), TD Ex. 6.
.

of the Massachusetts Colony 74-75 (1679), TD Ex. 10.[11]   The practice of denying ammunition

sales to potential enemies, and the Governor's oversight over such sales, continued into the

Eighteenth Century, with New York Governor George Clinton writing to London in 1744 that he

had "issued [] Proclamations to forbid the Exportation of Gun powder, or the supplying the French

with any kind of provisions, warlike stores, or mechandizes."   VI John Broadhead, Documents

Relative to the Colonial History of the State of New-York 254-55 (1855), TD Ex. 11.

   ***Colonial Disarmament Laws.***   In the colonial era and at the time of the Founding, states

passed laws disarming members of groups perceived to be dangerous, with the provisions for

disarmament extending to possession of ammunition.   The first of these came in 1637, when the

Massachusetts Bay Colony, fearing a "suddaine irruption" of violence from followers of two

dissident Protestant preachers, ordered that certain persons be disarmed of "all such guns, pistols,

swords, powder, shot, & match as they shalbee owners of," with their arms to be returned if they

appeared in person to swear an oath or were exempted by two magistrates.[12]   1 Nathaniel B.

Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England 211

(1853), TD Ex. 12; see United States v. Young, 639 F. Supp. 3d 515, 525 (W.D. Pa. 2022) (this

law "demonstrates that it was not only firearms, but also ammunition and other associated

accessories that had been historically regulated").   In 1677, shortly after the bloody conflict known

as "King Philip's War," Rhode Island enacted a law authorizing "any inhabitant of this Island that

---

[11] A separate section of the same Massachusetts law prohibited "any French-man, Dutch-man, or any person of any other Foreign Nation whatsoever, or any English dwelling amongst them" from trading with natives, for fear that foreigners or foreign agents would "Trade Guns, Powder, Shot, &c."  Rawson, The General Laws and Liberties of the Massachusetts Colony, at 75.

[12] Several of the historical antecedents cited in this brief contain race-based or religion-based assessments of dangerousness, which would never pass constitutional review in 2023. The unfortunate reality is that the seventeenth-, eighteenth-, and nineteenth-century laws to which Bruen directs the constitutional inquiry often codified prejudices that existed at the time. This has not prevented courts from treating such laws as relevant to ascertaining the historical understanding of the scope of the Second Amendment. See, e.g., Kanter v. Barr, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting).  Put another way, such laws if evaluated today would violate the Fourteenth Amendment, not the Second.

shall meet any Indian or Indians with either gun or guns, or ammunition to take them from him or them."  2 Records of the Colony of Rhode Island and Providence Plantations 561 (1857), TD Ex. 13.  Virginia in 1756 passed a similar law regarding Roman Catholics, based on a conclusion that "it is dangerous at this time to permit Papists to be armed," and ordering that all Catholics be required to turn over "any arms, weapons, gunpowder or ammunition" unless permitted "by order of the justices of the peace at their court."  VII William Waller Hennig, A Collection of All the Laws of Virginia 35 (1820), TD Ex. 14.  Such laws generally would allow for persons to reacquire the right to bear arms upon appearing in person to swear an oath of allegiance or otherwise demonstrate that they did not pose a danger to the community.

   ***Revolutionary Loyalty Laws***.  Laws enacted at the same time the United States was founded demonstrate the constitutionality of measures preventing ammunition possession by dangerous persons.  On March 14, 1776, the Continental Congress ordered each colony to disarm persons "who are notoriously disaffected to the Cause of America, or who have not associated and refuse to associate to defend by Arms these United Colonies."  1775-76 Mass. Acts & Laws 31-32, TD Ex. 15.  These measures explicitly extended to possession of ammunition as well.  See id. at 32 (Massachusetts ordering seizure of "all such Arms, Ammunition and Warlike Implements, as by the strictest Search can be found in his Possession"); see also, e.g., 1776-77 N.J. Acts 90, TD Ex. 16 (New Jersey Council of Safety "empowered and directed to deprive and take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements and Ammunition which they own or possess"); 1778 Pa. Laws 126, TD Ex. 17 (Pennsylvania law that persons not taking a loyalty oath may not "carry any arms about his person or keep any arms or ammunition in his house or elsewhere").

As another New York federal district court has noted, these colonial and Revolutionary-era laws amount to "compelling evidence of a tradition of barring those deemed dangerous from possessing ammunition." White, 2023 WL 6066201, at *6; see also Young, 639 F. Supp. 3d at 525 ("the statutory prohibition of felons possessing . . . ammunition . . . is consistent with this Nation's tradition of firearm regulation.").  And the conclusion is further buttressed by the long American history of preventing dangerous people from possessing firearms themselves, since "[t]he protection that ammunition enjoys under the Second Amendment is derivative of the right to bear arms."  September 21 Opinion at 5; cf. United States v. Jackson, 69 F.4th 495, 502-05 (8th Cir. 2023) (surveying the history of English and American laws preventing dangerous persons and groups from firearms possession).  Accordingly, ammunition background checks, to the extent they relate to the bearing of "arms" at all, "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" Bruen 142 S.Ct. at 2138 n.9 (quoting Heller, 554 U.S. at 635)), and comfortably pass Bruen's historical test.

### D.    The Nominal Fees Supporting the Background Check System Are Constitutional

Like the law requiring background checks for ammunition sales, the practice of charging a nominal fee is amply supported by law and history.  Although the Plaintiffs' challenge should fail at Bruen Step One because a $2.50 fee is simply too negligible to constitute an "infringement" under the original public understanding of the term, see Section II(B)(1), above, the fee comfortably passes constitutional scrutiny anyway, either under the Supreme Court's long-established "fee jurisprudence" or under the historical analysis at Bruen Step Two.

### 1.    The Law Governing Fees In Connection With Constitutional Rights

The constitutionality of fees in connection with constitutional rights has been established under a large body of Supreme Court and Second Circuit case law, which strongly supports

upholding the $2.50 background check fee.  The exercise of Constitutional rights may be

regulated for purposes such as public safety, and it is black-letter law that "imposing fees on the

exercise of constitutional rights is permissible when the fees are designed to defray (and do not

exceed) the administrative costs of regulating the protected activity."  Kwong v. Bloomberg, 723

F.3d 160, 165 (2d Cir. 2013) (collecting cases).  The Supreme Court's fee jurisprudence stems

from its 1941 ruling in Cox v. New Hampshire, upholding a state law that required parties

seeking a parade permit to pay a license fee that "had a permissible range from $300 to a

nominal amount."  312 U.S. 569, 576 (1941).  The unanimous Court noted that the fee was "not

a revenue tax, but one to meet the expense incident to the administration of the [license system]

and to the maintenance of public order in the matter licensed" before concluding that "[t]here is

nothing contrary to the Constitution in the charge of a fee limited to the purpose stated."  Id. at

577.[13]

Caselaw likewise demonstrates that the Constitution permits the imposition of reasonable

regulatory fees in a host of other areas that implicate fundamental rights.  For instance, there is a

fundamental constitutional right to sue and to access the courts, but federal law requires civil

plaintiffs to pay $402 to do so.  See 28 U.S.C. § 1914(a) & Judicial Conference Fee Schedule ¶

14 (2020); cf. Ortwein v. Schwab, 410 U.S. 656 (1973) (civil filing fees do not violate due

process).  The Sixth Amendment provides every criminal defendant with a right to counsel

provided at public expense, see Gideon v. Wainwright, 372 U.S. 335 (1963), but states across the

country nonetheless either require the payment of minor fees in connection with the appointment

---

[13] Although regulatory fees are often "nominal" in amount – and the $2.50 background check fee at issue in this case certainly is – the Supreme Court and the Second Circuit have both emphasized that a fee need not be nominal (or even small) to be constitutional.  See Kwong, 723 F.3d at 166 n. 11 ("we reject plaintiffs' argument that a fee must be 'nominal' for it to be permissible under the Supreme Court's 'fee jurisprudence.'") (citing Forsyth County, Ga. V. Nationalist Movement, 505 U.S. 123, 137 (1992)).

of a public defender or authorize the recouping of legal costs from a defendant at the end of the representation.[14]  Such fees are constitutional under long-settled Supreme Court jurisprudence.[15] See Fuller v. Oregon, 417 U.S. 40, 52-54 (1974).  Likewise, the Second Circuit has upheld the constitutionality of reasonable tolls on roads and bridges, despite acknowledging their impact on the fundamental constitutional right to travel.  See Selevan v. N.Y. Thruway Auth., 711 F.3d 253, 257-61 (2d Cir. 2013).  And marriage is a fundamental constitutional right, but "it is undoubtedly constitutional for New York to regulate marriage by requiring a marriage license and charging a $30 fee for that license."  Kelly v. New York, No. 19 Civ. 2063, 2020 WL 7042764, at *9 (E.D.N.Y. Nov. 30, 2020) (citing Zablocki v. Redhail, 434 U.S. 374, 386 (1978)).

Regulatory fees are just as constitutional in the Second Amendment context.  The governing precedent is Kwong v. Bloomberg, 723 F.3d 160 (2d Cir. 2013), in which the Circuit upheld the constitutionality of New York City's $340 pistol license fee because it "is designed to defray (and does not exceed) the administrative costs associated with the licensing scheme."  Id. at 166; see also id. at 167-68 (finding that the fee did not substantially burden anyone's Second Amendment right).  Kwong "remains controlling precedent in this Circuit, given that it relied on Heller and McDonald, cases that were later reaffirmed by Bruen."  United States v. Craft, No. 23 Cr. 178, 2023 WL 6215326, at *3 (S.D.N.Y. Sept. 25, 2023) (pre-Bruen Second Circuit case remains "binding unless and until it is overruled by the [Circuit] en banc or by the Supreme Court").  And the Second Circuit is just one of many federal courts across the country that have upheld reasonable regulatory fees against Second Amendment challenges, both before and after

---

[14] See generally Maraea Beemen, et al., At What Cost?  Findings from an Examination into the Imposition of Public Defense System Fees, National Legal Aid & Defender Association (July 2022), 82-96 (summarizing the various provisions in each state's law), available at https://www.nlada.org/sites/default/files/NLADA_At_What_Cost.pdf.

[15] The state laws regarding public defender fee application or recoupment generally contain exceptions for the truly indigent.  See Fuller, 417 U.S. at 53.  Of course, there is no allegation in this case that any of the individual defendants lack the resources to pay the $2.50 background check fee.

Bruen.  See, e.g., Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose, No. 22-cv-501, 2023 WL

4552284, at *8 (N.D. Cal. July 13, 2023) ("San Jose II"); Koons v. Platkin, Civ. No. 22-7464,

2023 WL 3478604, at *32-33 (D.N.J. May 16, 2023); United States v. Saleem, No. 21-cr-86,

2023 WL 2334417, at *11 n.9 (W.D.N.C. Mar. 2, 2023); O'Connell v. Gross, Civ. No. 19-11654,

2020 WL 1821832, at *8 (D. Mass. Apr. 10, 2020); Heller v. District of Columbia, 801 F.3d 264,

278 (D.C. Cir. 2015).

 Nothing in Bruen undermines the Supreme Court's long-settled fee jurisprudence.

Instead, the majority opinion is consistent with the proposition that regulatory fees remain

constitutional, noting only that the Court "do[es] not rule out constitutional challenges" if

"exorbitant fees deny ordinary citizens their right to public carry."[16]  142 S.Ct. at 2138 n.9; see

Nat'l Association for Gun Rights, Inc. v. City of San Jose, 632 F. Supp. 3d 1088, 1105 (N.D.

Cal. 2022) (Bruen "tacitly acknowledged that reasonable and non-exorbitant fees are

permissible").  Accordingly, federal courts applying the Bruen test have repeatedly upheld

firearm-related taxes and fees without historical analysis, so long as they are not so exorbitant as

to functionally deny the right to bear arms.  See, e.g., Saleem, 2023 WL 2334417 at 11 n.9; San

Jose II, 2023 WL 4552284 at *8; Koons, 2023 WL 3478604 at *33; Williams v. McFadden, No.

22-cv-630, 2023 WL 4919691, at *6 (W.D.N.C. Aug. 1, 2023).

 The $2.50 fee for an ammunition background check is constitutional under the Supreme

Court's fee jurisprudence.  The fee is "not a revenue tax, but one to meet the expense incident to

the administration of the [background check law] and to the maintenance of public order in the

matter licensed."  Cox, 312 U.S at 577.  It is "designed to defray (and do[es] not exceed) the

---

[16] Justice Thomas also noted the presumptive constitutionality of fees as part of his historical analysis, rejecting the idea that costs associated with 19th-century surety laws were "a severe constraint," finding their burden to be "insignificant," and declaring that "we have little reason to think" that the costs "would have prevented anyone from carrying a firearm for self-defense in the 19th century."  Id. at 2149.

administrative costs of regulating the protected activity."  Kwong, 723 F.3d at 165.  The fees

collected are directed only to the state background check fund, see N.Y. Executive Law § 228(5),

and the money used is "allocated for the direct costs associated with performing background

checks" and for no other purpose.  N.Y. State Fin. Law § 99-pp.  And the fee is so small that it

cannot constitute an "infringement," let alone the kind of "exorbitant" fee that would be

actionable under Bruen.

        2.       History Supports Appropriate Fees In Connection With Purchasing
               Ammunition

Even if the Court moves to Step Two of the Bruen test, a host of sources demonstrate that

the background check fee "is consistent with this Nation's historical tradition of firearm

regulation."  Bruen, 142 S.Ct. at 2126.  History demonstrates that our forefathers passed laws

allowing for direct taxation of firearms and ammunition, not to mention regulatory fees of the

sort contemplated by New York's background check law.

        a)      American history and tradition include the direct taxation of
               firearms and ammunition.

American history includes many examples of government directly taxing the trade in (or

possession of) firearms, gunpowder, and ammunition, with no indication that our forefathers

would have viewed such taxes as unconstitutional.  In 1680, the colony of Virginia enacted a tax

wherein every ship entering the colony would be required to pay "[o]ne half pound of good and

new Gunpowder, and Three Poinds of Leaden Shot" for every ton of cargo.  TD Ex. 18.  In 1789,

two years before the Second Amendment was adopted, Rhode Island imposed a ten percent tax

on all gunpowder imports.  1789 R.I Pub. Laws 7, TD Ex. 19.  In 1838, Florida enacted a law

prohibiting anyone from selling certain weapons "until he or they shall have first paid to the

treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars

per annum" – a figure equivalent to approximately $6,600 today.[17]  1838 Fla. Laws 36, TD Ex. 20.  In 1844, Mississippi enacted "a tax of two dollars on each duelling or pocket pistol" kept in private hands.  1844 Miss. Laws 58, TD Ex. 21.  In 1853, Virginia required merchants of gunpowder to obtain a license and be taxed, except for a "planter or farmer" who "may sell to his neighbors."  See 1853 Va. Acts. 17, TD Ex. 22.

In 1866, North Carolina enacted an annual tax of one dollar for "every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle-cane . . . used or worn about the person of any one at any time during the year."  1866 N.C. Laws 33, TD Ex. 23.  Delaware in 1869 enacted a percentage tax on "manufacturers of gunpowder."  1869 Del. Laws 360, TD Ex. 24.  Ohio required in 1883 that "[a]ll vendors of gunpowder shall pay a license fee of fifteen dollars per annum," and that "[a]ll keepers or owners of gunpowder magazines shall pay a license fee of one hundred dollars per annum."  1883 Ohio Laws 134, TD Ex. 25.  Alabama in 1884 imposed a $5 license fee on "dealers in pistol cartridges," 1884-85 Ala. Laws 604, TD Ex. 27, before raising the fee to $300 in 1887.[18]  1887 Ala. Laws 194, TD Ex. 28.  South Carolina in 1890 passed a law requiring anyone wishing to sell pistol cartridges to pay "the sum of two hundred dollars, annually," 1890 S.C. Acts 653, TD Ex. 29, before amending the statute the next year to apply to sales of pistols and rifle cartridges as well.[19]  1891 S.C. Acts 1101-02, TD Ex. 30.  Georgia appears to have enacted similar laws, as its Treasurer reported in 1893 that the state had brought in money from a "Pistol Dealers Tax."  1893 Ga. Laws 514, TD Ex. 31.  And Virginia in 1895 enacted a law

---

[17] All inflation calculations are done according to the Consumer Price Index Inflation Calculator at https://www.officialdata.org/us/inflation/.

[18] The validity of the Alabama law was challenged by a criminal defendant and sustained by the state Supreme Court, without any party suggesting that it infringed the right to bear arms.  See Porter v. State, 58 Ala. 66 (1877).

[19] Tennessee, meanwhile, had banned the sale of pistol cartridges altogether.  1883 Tenn. Pub. Acts 17, TD Ex. 26.

requiring a "special pistol and pistol-cartridge dealer's license" to sell guns and ammunition in certain counties, with an accompanying tax.  1895 Va. Acts 849-50, TD Ex. 32.

These sources demonstrate "an enduring American tradition of state regulation" allowing direct taxation of gun and ammunition sales to fund the general public revenue, with no indication that such laws were ever challenged, let alone found unconstitutional.  Bruen, 142 S.Ct. at 2155.  If direct taxes such as these are "consistent with this Nation's historical tradition of firearm regulation," id. at 2135, then a regulatory fee comfortably passes Bruen's scrutiny.

> b)  History provides many analogues for ammunition-related regulatory fees.

American history likewise includes a long tradition of laws imposing regulatory fees on guns or ammunition, where incidental charges were used to fund measures to protect public safety.  For instance, in 1763, New York City passed a statute requiring that all gunpowder be carried to a specific "Powder-House" in carts overseen by licensed "cart-men," who were supported by fees in proportion to the gunpowder carried.  Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York 16-20 (1763), TD Ex. 33.  Other colonies also enacted gunpowder safety measures supported by regulatory fees, with New Jersey for instance requiring all gunpowder offered for sale to be inspected and approved by government-appointed "Inspectors of Gun-Powder," whose wages would be "the one Eighth Part of a Dollar for every Hundred Weight of Gun-Powder he shall examine, to be paid by the Owner of said Powder."  1776 N.J. Acts 6-7, TD Ex. 34; see also, e.g., 1820 N.H. Laws 275, TD Ex. 35 (similar New Hampshire law providing that inspectors be paid "one cent for each pound of gun powder, by him examined . . . to be paid by the owner or owners of the gunpowder.").  Connecticut in 1826 enacted a law empowering the City of New Haven to regulate gunpowder sales and establish a licensing

regime, supported by a regulatory fee "for the use of the treasury of said city for each license a sum not exceeding fifty dollars." 1826 Conn. Pub. Acts 107, TD Ex. 36. In 1883, California provided that municipalities could take "all moneys received for licenses for the storage, manufacture, or sale of gunpowder" and use it to support their Fire Department. 1883 Cal. Stat. 156, TD Ex. 37. And Illinois in 1881 provided for a system of recordkeeping for all sales of deadly weapons, with each seller to keep a register enumerating "the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purchase for which it is purchase or obtained," which must be "kept open for the inspection of the public." 1881 Ill. Laws 73-74, TD Ex. 38. Failing to keep accurate records or to allow inspection resulted in a fine of up to $200, equivalent to over $6,000 today.[20] Id.

The historical fees discussed here, combined with the multitude of licensing fees and even direct taxes discussed in Section II(D)(2)(a), above, demonstrate that reasonable regulatory fees in connection with the sale of ammunition are "consistent with this Nation's historical tradition of firearm regulation." Bruen, 142 S.Ct. at 2126. Even if the nominal $2.50 fee for a background check were an "infringement" at Bruen Step One, and even if prior fee case law did not apply, the background check fee is still constitutional as a matter of law and history.

### E.     Plaintiffs' Factual Assertions Are Unsupported And Contradicted By NYSP's Data

Plaintiffs' preliminary injunction motion is predicated on a host of dramatic assertions, contending that "ammunition sales are effectively halted in this district under the law," ECF No. 5-1 at 3 (underline in the original), that "ammunition sales are prevented entirely," id. at 4 (same), or that there is an "outright prohibition of ammunition purchases." Id. at 6. But

---

[20] The statute also authorized private citizens to bring *qui tam* actions to ensure compliance, with half of any fine going to the plaintiff and the other half to the county treasury. 1881 Ill. Laws 74, TD Ex. 38.

Plaintiffs have provided no evidence to back up these sweeping claims: the assertions are based entirely on the four-paragraph Declaration of Aaron Dorr (NYSFA's executive director) and two photographs allegedly taken on September 14, 2023, the day after the system went into effect. See ECF No. 5-1 at 3 (identifying the Dorr Declaration as the only source for the proposition); see generally Dorr Dec., ECF No. 5-4.  Those pictures show no such thing.  One picture, from the Runnings in Canandaigua, says that sales are "[c]losed till Staff are trained on new software." ECF No. 5-4 at 3.  Runnings' decision to close while training staff, of course, is not state action, and the sign indicates that the store would reopen as soon as the training was done.  See id.  The other picture is an unsigned handwritten note saying "E-NICS is down no guns or ammo sorry." ECF No. 5-4 at 4.  The note provides no reason to believe that the ammunition background check system is not functioning, particularly when it references NICS, a separate federal database that plays no role in the State ammunition background check process.  See Chiumento Dec. ¶ 26.

Plaintiffs' implication that ammunition purchases have been halted is contradicted by the evidence.  Between September 13, 2023 and October 9, 2023, a period just over three weeks, NYSP processed 22,082 firearm transactions and 29,464 ammunition transactions.  Id. at ¶ 38. The data shows that background checks are not providing any barrier to law-abiding gun owners obtaining ammunition, with over 98% of ammunition background checks resulting in approval to purchase without delay.  Id. ¶¶ 38-39.  Plaintiffs' dramatic assertion that "ammunition sales are effectively halted," ECF No. 5-1 (emphasis in the original) is both unsupported and wrong.

## III.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM

Plaintiffs cannot make the required "strong showing" of irreparable harm.  Bimber's Delwood, Inc. v. James, 496 F. Supp. 3d 760 (W.D.N.Y. 2020). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be

remedied if a court waits until the end of trial to resolve the harm." Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc., 149 F. Supp. 3d 376, 390 (E.D.N.Y. 2016) (quoting Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007)).

**First**, Plaintiffs' "[l]ack of diligence, standing alone" negates any claim of irreparable harm. Brooklyn Brands LLC v. Lieberman, No. 18 Civ. 7245, 2018 WL 10246003, at *1 (E.D.N.Y. Dec. 23, 2018). The CCIA was passed on July 1, 2022, but Plaintiffs did not file this lawsuit until September 13, 2023, more than fourteen months later. See ECF No. 1. Settled law in this Circuit establishes that waiting over a year is simply too long of a delay to obtain a preliminary injunction. See Occhipinti v. Annucci, No. 19-cv-6651, 2022 WL 1152842, at *2 (W.D.N.Y. Apr. 19, 2022) (Geraci, J.) (collecting cases and noting that "[c]ourts have declined to grant preliminary injunction based on unexplained delays of as little as two months"); See, e.g., McGregor v. Suffolk County, No. 23-cv-1130, 2023 WL 6521622, at *5 n.6 (E.D.N.Y. Sept. 7, 2023) ("inexplicable delay" of seven months in challenging gun law passed at the same time as the CCIA was "sufficient to depose of" preliminary injunction motion).

**Second**, Plaintiffs have not made the required strong showing of irreparable harm from the background check requirement, since their pleading indicates that each individual Plaintiff would almost certainly pass (and has done so before). See AC ¶¶ 22-25 (each individual plaintiff has previously "passed a background check"). There is thus no basis to conclude that a background check would prevent any Plaintiff from bearing arms. Cf. Bruen, 142 S.Ct. at 2138 n.9 ("we do not rule out constitutional challenges" if a law including background checks were to "deny ordinary citizens their right to public carry"). And **third**, Plaintiffs' challenge to the background check fee cannot constitute irreparable harm as a matter of law since any damages would be monetary in nature and easily redressable. See Hayvin Gaming, LLC v. Workinman

Interactive, LLC, No. 23-CV-6172, 2023 WL 3748844, at *3 (W.D.N.Y. June 1, 2023) (Geraci, J.) ("To satisfy the irreparable harm requirement, a movant must show that there is a continuing harm which cannot adequately be addressed by final relief on the merits and for which money damages cannot provide adequate compensation."); see also CRP/Extell Parcel I, L.P. v. Cuomo, 394 F. App'x 779, 781 (2d Cir. 2010) (summary order) ("We have long held that an injury compensable by money damages is insufficient to establish irreparable harm.").

## IV. THE EQUITIES AND PUBLIC INTEREST SUPPORT THE CONTINUED IMPLEMENTATION OF THE BACKGROUND CHECK SYSTEM

Lastly, the balance of equities and the public interest, which "merge when the Government is the opposing party," Nken v. Holder, 556 U.S. 418, 435 (2009), weigh strongly against enjoining the background check system. The ammunition background check system is working effectively to protect New Yorkers: in just over three weeks, the system has prevented between 161 and 373 instances where prohibited persons would have gained access to ammunition, in violation of federal and state law.[21] Each instance promotes public safety, prevents a crime, and averts a deadly threat. If the Court enjoined the background check system, such transactions would go through, with potentially fatal consequences. Meanwhile, the effect on Plaintiffs if an injunction is denied during the pendency of these proceedings would be negligible. The background check is providing no impediment to lawful gun owners obtaining ammunition, with 98.6% of checks resulting in a "proceed" status, see Chiumento Dec. ¶ 34, and there is every reason to assume that the Plaintiffs' background checks would likewise allow them to obtain ammunition without issue. The equities therefore strongly favor allowing the ammunition background check system to continue protecting New Yorkers' public safety.

---

[21] The higher figure represents the 161 denials plus the 231 background checks delayed for manual review, minus the 19 denials overturned on appeal. See Chiumento Dec. ¶¶ 35-37.

## **CONCLUSION**

For the foregoing reasons, Superintendent Chiumento respectfully requests that the motion for a preliminary injunction be denied in its entirety, and that the Court grant such other and further relief as it deems just and proper.


Dated:  Rochester, New York
        October 13, 2023

LETITIA JAMES
Attorney General
State of New York
*Attorney for Superintendent Chiumento*

By: _____

Matthew D. Brown
Heather L. McKay
Assistant Attorneys General
144 Exchange Blvd., Suite 200
Rochester, New York 14614
Tel: (585) 327-3207
matthew.brown@ag.ny.gov
heather.mckay@ag.ny.gov

James M. Thompson
Special Counsel
28 Liberty Street, 18th Floor
New York, NY 10005
Tel: (212) 416-6556
james.thompson@ag.ny.gov