# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

NEW YORK STATE FIREARMS ASSOCIATION,

et al.,

                 *Plaintiffs*,

v.                                           Civil Action No. 23-CV-6524-FPG

DOMINICK L. CHIUMENTO, in his official capacity as
Acting Superintendent of the New York State Police,

                 *Defendant*.

_____/

# PLAINTIFFS' REPLY IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

Ginger D. Schröder
Schröder, Joseph & Associates, LLP
394 Franklin Street, Second Floor
Buffalo, New York 14202
(716) 863-4000
gschroder@sjalegal.com

Stephen R. Klein*
BARR & KLEIN PLLC
1629 K St. N.W. Ste. 300
Washington, DC 20006
(202) 804-6676
steve@barrklein.com

Benjamin Barr*
BARR & KLEIN PLLC
444 N. Michigan Avenue, Ste. 1200
Chicago, IL 60611
(202) 595-4671
ben@barrklein.com

* *Pro hac vice* application pending.

*Attorneys for George Borrello, David DiPietro, William Ortman, Aaron Dorr
and the New York State Firearms Association*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

Introduction................................................................................................................. 1

REPLY ARGUMENT ................................................................................................. 2

    I.     This Court Has Jurisdiction Over the Plaintiffs' Claims ................................ 2

        A.     The New York State Firearms Association Has Associational Standing .................. 2

        B.     The Individual Plaintiffs May Challenge Ammunition Background Checks ............. 4

    II.    The Plaintiffs Have a Strong Likelihood of Success on the Merits ............................... 7

        A.     Plaintiffs Have Presented As Applied and Facial Challenges ................... 8

        B.     Redundant Ammunition Background Checks Implicate the Second Amendment ..... 9

        C.     Redundant, Repetitive Ammunition Background Checks Have No Historical Analogue ...... 10

        D.     The Fees Charged Per Background Check Per Ammunition Purchase Are Unconstitutional ...... 15

        E.     The Superintendent Has Not Contradicted Anything ................................. 18

    III.    Plaintiffs Have Demonstrated Irreparable Harm ....................................... 18

    IV.    The Public Interest Lies with the Right to Keep and Bear Arms ................................ 19

CONCLUSION................................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ...................................................... 8

*Community Housing Improvement Program v. City of N.Y.*, 59 F.4th 540 (2d Cir. 2023) ............ 8

*Connecticut Citizens Defense League, Inc. v. Lamont*, 6 F.4th 439 (2d Cir. 2021) ...................... 3

*Cox v. New Hampshire*, 312 U.S. 569 (1941) ............................................................................... 15

*Davis v. Fed. Election Comm'n*, 554 U.S. 724 (2008) ................................................................... 7

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................................ 1, 11, 17

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000) ........... 2

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977) ................................ 2

*Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) ................................................................................ 7

*Korematsu v. U.S.*, 323 U.S. 214 (1944) ..................................................................................... 12

*Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013) ..................................................................... 15

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................................... 4

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..................................................................... 15

*N.Y. Civil Liberties Union v. N.Y. City Transit Authority*, 684 F.3d 286 (2d Cir. 2012) ................ 3

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022) ................................. passim

*N.Y. Times Co. v. U.S.*, 403 U.S. 713 (1971) ........................................................................ 11, 14

*Naperville Smart Meter Awareness v. City of Naperville*, 69 F.Supp.3d 830 (N.D. Ill 2014) ... 3, 4

*Near v. Minnesota*, 283 U.S. 697 (1931) ..................................................................................... 14

*Pen American Center, Inc. v. Trump*, 448 F.Supp.3d 809 (S.D.N.Y. 2020) ................................. 3

*Rhode v. Becerra*, 445 F.Supp.3d 902 (S.D. Cal. 2020) ........................................................ 11, 13

*Robinson v. Sessions*, 721 F. App'x 20 (2d Cir. 2018) ................................................................. 5

*Rodriguez v. Winski*, 444 F.Supp.3d 488 (S.D.N.Y. 2020) .......................................................... 3

*Scott v. Sanford*, 60 U.S. (19 How.) 393 (1856) ........................................................................ 12

*State v. Newsom*, 27 N.C. (5 Ired.) 250 (1844) ............................................................ 13

*Summers v. Earth Island Institute*, 555 U.S. 488 (2009) ......................................... 2, 3

*U.S. v. Harrison*, 22-CR-328, 2023 WL 1771138 (Feb. 3, 2023 W.D. Okla.) ...................... 12, 13

*U.S. v. Miller*, 307 U.S. 174 (1939) ........................................................................... 7

*Warth v. Seldin*, 422 U.S. 490 (1975) ....................................................................... 2

*White v. Engler*, 188 F.Supp.2d 730 (E.D. Mich. 2017) .............................................. 3, 4

**Statutes**

N.Y. EXEC. § 228 ....................................................................................................... 1, 20

N.Y. PENAL § 265.01-e(2) ........................................................................................... 1

N.Y. PENAL § 400.02 .................................................................................................. 1, 20

N.Y. PENAL § 400.03 ............................................................................................... 1, 9, 20

Pub. L. No. 68-175, 43 Stat. 253 (1924) ..................................................................... 12

**Other Authorities**

4 JOURNALS OF THE CONTINENTAL CONGRESS, 1774-1789 (Washington Chauncey Ford ed., 1906) ............................................................................................................... 13

Derek Heid, *'75% of our customers have been delayed': Ammo background checks continue to bring stores and customers issues*, WKBW BUFFALO, Sept. 25, 2023 .................................. 18

Eric Tichy, *Local sheriff stymied in ammo purchase after new law kicks in*, NIAGARA GAZETTE, Oct. 22, 2023 ..................................................................................................................... 18

Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695 (2009) .............................................................................................................................. 13

Leonard W. Levy, EMERGENCE OF A FREE PRESS (1985) ................................................. 12

MERRIAM WEBSTER ....................................................................................................... 15

Peter Henderson, Daniel Trotta, *What's missing in U.S. gun control scramble? Bullets.*, REUTERS, Jan. 20, 2013 ................................................................................................... 16

THE FEDERALIST (Clinton Rossiter ed., 1961). ................................................................. 12

*What Percentage of Americans Own Guns?*, GALLUP, Nov. 13, 2020 ................................ 16

**Constitutional Provisions**

U.S. CONST. amend. I.................................................................................... 11, 14, 15, 16

U.S. CONST. amend. II ............................................................................................... passim

# INTRODUCTION

Before this Court is the tried and tired recalcitrance of a state government toward constitutional rights. Unable to ban the keeping and bearing of common firearms, the majority of the New York State Legislature and certain state executives have endeavored to make it as onerous as possible, including implementing a background check and fee for every single purchase of ammunition by law-abiding citizens who have already passed a background check and registered their firearms. N.Y. PENAL §§ 400.02, 400.03; N.Y. EXEC. § 228; *cf. N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2131 (2022). When sued to account for it, the Superintendent denies that the burdens of background checks are a constitutional infringement to begin with, offers a factual account of the background check system with gaping holes, and presents historic laws that are nothing close to analogous to background checks for every single purchase of ammunition. The ammunition background check laws are unconstitutional under the Second Amendment and should be enjoined. N.Y. PENAL §§ 400.02, 400.03; N.Y. EXEC. § 228.

The years following *District of Columbia v. Heller* were a saga for the Second Amendment, and the post-*Bruen* years might be no different. 554 U.S. 570 (2008). Even after *Bruen* there are facets of the CCIA that unconstitutionally ban the bearing of arms. *See* N.Y. PENAL § 265.01-e(2) (identifying myriad "sensitive places" where one cannot carry concealed weapons even with a permit). The Superintendent's arguments for the ammunition background check provisions muddle *Bruen* into approval for anything short of firearms bans, and ironically twist the Second Amendment into a blessing for a more restrictive regulatory regime than ever experienced before even in New York State—or anywhere, for that matter. The Superintendent seizes upon *Bruen*'s approval of firearm background checks in shall-issue carry regimes, claiming they are no burden and can effectively be imposed on *any* firearm activity, at any time, in any number. 142 S.Ct. at 2138 n.9. Faced with repetitive background checks to purchase ammunition for firearms that are

1

already approved and registered, eventually jurisprudence will recognize that the process itself and "lengthy wait times" accrue from enduring the same scrutiny over and over (and *over*) again to exercise a fundamental right. *Id.* That jurisprudence should begin here.

## REPLY ARGUMENT

### I.    This Court Has Jurisdiction Over the Plaintiffs' Claims

The Superintendent endeavors to escape the case entirely by claiming the Court lacks jurisdiction—specifically, that the Plaintiffs lack standing.[1] ECF No. 19 at 16-20. These arguments are without merit.

### A.  The New York State Firearms Association Has Associational Standing

Even in the "absence of injury to itself, an association may have standing solely as the representative of its members." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342 (1977) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Today, the Supreme Court employs a three-factor test to analyze associational standing: (1) Members of an association must have standing to sue in their own right; (2) The interests at stake are germane to the organization's purpose; and (3) Neither the claim asserted nor relief at issue requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt*, 432 U.S. at 343)). As recently as 2009, the Supreme Court referred to the fact that it is "common ground that [] organizations can assert the standing of their members." *Summers v. Earth Island Institute*, 555 U.S. 488, 494 (2009). Of course, mere generalized harm will not suffice, but if a "harm in fact affects the recreational or even mere

---

[1] The Superintendent has withdrawn his claim that he was not personally served. *Compare* ECF No. 22 *with* ECF No. 19-2 (Affidavit of Michael W. Deyo). Thus, this section will only address NYSFA's associational standing and the individual standing of Messrs. Borrello, DiPietro, Ortman and Dorr, respectively. ECF No. 19 at 16-20.

esthetic interests of the plaintiff, that will suffice." *Id.* Other courts nationwide follow this approach in favor of associational standing. *White v. Engler*, 188 F.Supp.2d 730, 743 (E.D. Mich. 2017); *Naperville Smart Meter Awareness v. City of Naperville*, 69 F.Supp.3d 830 (N.D. Ill 2014).

The Superintendent cites *Connecticut Citizens Defense League, Inc. v. Lamont*, 6 F.4th 439 (2d Cir. 2021), to argue that an organization lacks standing to assert the rights of its members. ECF No. 19 at 8-9. However, footnote six of that opinion clearly provides that the Citizens Defense League did not assert the rights of its members, as NYSFA does here. ECF No. 4 at 8-9 (¶27). The court thus analyzed the rights of the non-profit as a group for standing purposes. *Lamont*, 6 F.4th at 447. Here, NYSFA is not asserting its rights, but rather alleges that the rights of its members are in controversy with redressable injuries, that the members interests align with that of NYSFA, and the nature of relief sought here does not require the individual involvement of members.

Second Circuit precedent is clear elsewhere that under "representational" or "associational" standing, groups may bring claims on behalf of their members. *N.Y. Civil Liberties Union v. N.Y. City Transit Authority*, 684 F.3d 286, 294 (2d Cir. 2012). Under such an approach, a party must show "that some particular member of the organization would have had standing to bring the suit." *Id.* This has been followed by district courts in the Second Circuit. *See, e.g.*, *Rodriguez v. Winski*, 444 F.Supp.3d 488, 496–97 (S.D.N.Y. 2020); *Pen American Center, Inc. v. Trump*, 448 F.Supp.3d 809, 320–21 (S.D.N.Y. 2020).

Consistent with *Hunt*, *Summers*, and *Laidlaw*—associational standing is met here. First, the question of whether New York may impose an ahistorical background check and fee every time an ammunition purchase is made is an issue individual Plaintiffs—members of NYSFA— have standing to challenge and which is redressable by this Court. *See infra* part I(B); ECF No. 4 at 3-4 (¶¶7, 9) (Mr. Ortman is member of NYSFA; Mr. Dorr its executive director); *see also*

Exhibits 1-10 (declarations of NYSFA members attesting to myriad failures of ammunition background check system and significant delays). Second, as noted in Plaintiffs' First Amended Complaint, the NYSFA advocates for the protections of the right to keep and bear arms—codified in the Second Amendment to the U.S. Constitution and New York Civil Rights Law article II, section 4—through grassroots advocacy and engagement with New York policymakers. *Id.* at 3-4 (¶8). Thus, whether New York may impose ahistorical background checks for ammunition purchases establishes a commonality between members' interests and NYSFA. Third, like *Naperville Smart Meter Awareness* and *Engler*, since Plaintiffs seek injunctive and declaratory relief, individual participation is not required. 69 F.Supp.3d at 837–38; 188 F.Supp.2d at 743.

## B.  The Individual Plaintiffs May Challenge Ammunition Background Checks

The individual plaintiffs have suffered a concrete injury just like myriad members of the NYSFA: an *ad nauseum* assessment of their right to bear arms and fee for the same. As of September 13, 2023, background checks must occur every time the Plaintiffs purchase ammunition for firearms already known to the Superintendent. Assessing the merits of ongoing background checks under the Second Amendment will redress this ongoing harm. This infringement is plainly an injury that is imminent, caused directly (indeed, solely) by the provisions of the CCIA at issue as enforced by the Superintendent, and subject to review and redressability in federal court. The individual Plaintiffs, some part of and otherwise separate from the NYSFA, have amply shown standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

The Superintendent asserts that because "there is every reason to believe" the Plaintiffs would pass background checks to purchase ammunition, there is no injury. ECF No. 19 at 18. Indeed, Messrs. Borrello, DiPietro, Ortman and Dorr passed background checks to purchase and possess firearms in New York, respectively. ECF No. 4 at 7-8 (¶¶ 22-25). But, as affirmed in *Bruen*, a cause of action lies where "lengthy wait times in processing license applications or

exorbitant fees deny ordinary citizens their right to public carry." 142 S. Ct. at 2138 n.9. And *Bruen* also provides that if New York lacks a proper historical analogue to its ammunition background check, then the law is unconstitutional and no judicial balancing of burdens should occur. *Id.* at 2129-31. Ammunition background checks are the same process by which the individual plaintiffs purchased their firearms in the first place, save only that the Superintendent is now an intermediary middleman or "point of contact" for firearm background checks instead of the federal government directly. ECF No. 19-1 at 4-5 (¶20). Thus, checks to make legal and registered firearms functional—that is, to purchase ammunition—are *per se* lengthy wait times, whether they take minutes, hours, or days. *Cf. Robinson v. Sessions*, 721 F. App'x 20, 22 (2d Cir. 2018) ("The appellants do not allege, however, that they were denied firearms *or they suffered delay in purchase*[.]" (emphasis added)). Here, the delay *is the very process itself*, and the individual Plaintiffs have standing to challenge it, including Messrs. Borrello, DiPietro and Ortman. ECF No. 4 at 7 (¶¶22-24).

To Mr. Dorr, specifically, who endeavored to purchase ammunition twice in one day at two different locations and submit to the background check, the Superintendent has not offered an apology, and barely acknowledges the failures and delays that have occurred and that have continued. He instead provides this Court a terse, almost non-denial. ECF No. 4 at 8 (¶25); *cf. Robinson*, 721 F. App'x at 23–24 ("There is no evidence that any of these appellants were delayed in purchasing a firearm . . ."). The Superintendent claims that "[Plaintiffs'] contention that the license and record database is offline is contradicted by the tens of thousands of ammunition background checks the NYSP has conducted without incident." ECF No. 19 at 19. But in addition to Mr. Dorr's experience that he's already sworn to, the Plaintiffs offer the attached declarations from other NYSFA members, all law-abiding New York gun owners. *See* Exhibits 1-10; ECF No.

5-4 (Dorr Declaration). If the Superintendent wanted to rebut Mr. Dorr's claim, he would have provided information about when the system has malfunctioned and, in those instances, for how long. The Superintendent offers no denial that the system was offline on September 14, 2023. Instead, he only swears that "there has not been any significant downtime since the system went live[.]" ECF No. 19-1 at 9 (¶46). The Superintendent has an abnormal definition of "significant."[2] The system was also entirely unavailable for significant periods of time on September 19, September 28, October 10, October 14, October 20, October 24, and October 25. Exhibits 1-7.

Mr. DiPietro, specifically, wishes to sell Mr. Ortman a box of .22 Long Rifle, but cannot without incurring a $1,000 fine for not registering as a seller of ammunition or enlisting a registered seller or firearms dealer who will enlist the Superintendent as an intermediary to the federal government to oversee the purchase with a background check. ECF No. 4 at 8 (¶ 26). The Superintendent and his counsel appear to be, at best, incongruent as to what constitutes a "'seller of ammunition.'" ECF No. 19 at 19-20 (quoting N.Y. PENAL §§ 265.00(24)). The briefing claims

---

[2] It bears noting that the law requires even *insignificant* "downtime[s]" to permit the sale of ammunition without a background check:

> This requirement of this section shall not apply (i) if a background check cannot be completed because the system is not operational as determined by the superintendent of state police, or where it cannot be accessed by the practitioner due to a temporary technological or electrical failure, as set forth in regulation, or (ii) a dealer or seller has been granted a waiver from conducting such background check if the superintendent of state police determines that such dealer is incapable of such check due to technological limitations that are not reasonably within the control of the dealer, or other exceptional circumstances demonstrated by the dealer, pursuant to a process established in regulation, and at the discretion of such superintendent.

N.Y. PENAL § 400.03(5). The Superintendent has not even proposed regulations to define when the system is "not operational" or what constitutes being "incapable of such check due to technological limitations", among other items.

"DiPietro has not plausibly alleged (let alone demonstrated sufficiently for the purposes of his preliminary injunction motion) that he would be a person subject to the challenged statute[.]" ECF No. 19 at 19. Yet the Superintendent swears that "*[a]ny individual* engaged in the commercial sale of ammunition, whether sporadically or full-time, is required to register." ECF No. 19-1 at 4 (¶14). The Superintendent himself has demonstrated Mr. DiPietro's standing.

"A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (standing to challenge asymmetrical campaign contribution limits). The challenged provisions implicate interests at the core of the Second Amendment and law-abiding, firearms-carrying, ammunition-using citizens enjoy every right to challenge their existence.

## II.     The Plaintiffs Have a Strong Likelihood of Success on the Merits

New York's ammunition background check and attendant fee is not like a parade permit: it's like forcing *everyone walking on the streets to get a permit to speak every day*. *Bruen* requires this Court to ask whether the conduct a plaintiff plans to engage in is within the reach of the Second Amendment. 142 S.Ct. at 2129–30. If so, then the Second Amendment protects that conduct. The government must then demonstrate that its "firearms regulation is part of the historical traditional that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. Only where government can identify a "well-established and representative historical analogue" may a "court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (internal quotations and citations omitted). Here, the right to possess firearms for protection "implies a corresponding right" to obtain ammunition. *Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir. 2022) (vacated on other grounds); *U.S. v. Miller*, 307 U.S. 174, 180 (1939). And there is no historical analogue that permits a never-ending series of background checks for

ammunition purchases. Such checks and associated fees should be ruled unconstitutional and enjoined.

### A.  Plaintiffs Have Presented As Applied and Facial Challenges

The Superintendent argues that Plaintiffs have only raised a facial challenge to New York's ahistorical ammunition background check law. ECF No. 19 at 20-21. But any distinction between facial or as-applied challenges speak to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 332 (2010). This matter may be resolved either as applied or facially—as the distinction between such challenges "is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Id. Bruen* itself is a novel development in constitutional law that eschews any form of "judge-empowering interest-balancing" inquiries. 142 S.Ct. at 2129. Instead of engaging in traditional means-ends analyses, *Bruen* instructed:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129–30. Under such an approach, the artificial line between facial and as-applied challenges further weakens as already observed in *Citizens United*.

Under a facial analysis, Plaintiffs must show that no set of circumstances exist under which the law would be valid. *Community Housing Improvement Program v. City of N.Y.*, 59 F.4th 540, 548 (2d Cir. 2023). Per *Bruen*, this is an easy enough task—New York is not trying to prevent Papists or Native Americans from purchasing ammunition and, even if it were, the outdated legal provisions relied on by the Superintendent carries no weight today. There are simply no historical

analogues supporting New York's novel, never-ending series of background checks for the purchase of ammunition, and that supports facial invalidation. Relatedly, this Court may also review the circumstances and facts of each Plaintiff to reach a similar conclusion under an as-applied analysis. *See, e.g.*, ECF No. 4 at 8 (¶26).

## B.   Redundant Ammunition Background Checks Implicate the Second Amendment

The Superintendent intends, like his standing arguments, to foreclose a merits consideration by claiming that the Second Amendment does not apply to any background checks in the first place. ECF No. 19 at 21-27. The Plaintiffs do not "simply assume that any regulation that touches on guns must be an 'infringement'"— rather, they rely on *Bruen*. *Id.* at 23. Perhaps recognizing this, the Superintendent attempts a sleight-of-hand, and presents footnote 9 of the majority opinion in *Bruen* as foreclosing Second Amendment challenges to background checks entirely instead of general approval for background checks for shall-issue carry permit regimes. *Id.* at 25. The Court's approval was qualified and clear: "*[W]e do not rule out constitutional challenges* to shall-issue regimes where, *for example*, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, 142 S. Ct. at 2138 n.9 (emphasis added).

As alleged, ammunition background checks for law-abiding citizens like the Plaintiffs are ridiculously redundant and *per se* lengthy. Mr. Dorr alleged and affirmed in his own sworn declaration that the ammunition background checks are uncertain to even be available at any given time, denying ammunition purchases entirely. This has occurred throughout New York in the weeks since the filing of this suit. *See* Exhibits 1-7. This stands in open defiance to N.Y. PENAL § 400.03(5), which assures the people of New York that ammunition sales will continue when software and system glitches or blackouts occur. This only adds to the burdens law-abiding,

responsible citizens face when they encounter New York's ammunition background check law. This is only half-heartedly contested, and certainly not contradicted, by the Superintendent, who only offers the total number of background checks completed in roughly a month's time and acknowledges that the system goes down. ECF No. 19-1 at 9 (¶46).

The Superintendent then argues that background checks are "conditions or qualifications on the commercial sale of arms", again categorizing this as a wholesale prevention of Second Amendment review. *Id.* at 25-27. Firearms are tangible property, and thus the Second Amendment only makes sense if it protects the commercial acquisition of said property by the people, including the Plaintiffs. This is, yet again, contradicted by the same footnote in *Bruen*: repetitive, lengthy wait times and fees, compounded by system failures that foreclose purchases entirely, are subject to challenge by lawful firearm owners. 142 S. Ct. at 2138 n.9.

If there is a "maximalist" concern to be found, it is in the Superintendent's argument. *Cf.* ECF No. 19 at 23. If his arguments hold, *any* firearms activity—from the purchase of firearms themselves to the purchase of ammunition to the purchase of accessories to renting a lane at the local firearms range—may be subjected to cumulative background checks. Since the Superintendent claims this goes beyond even commercial transactions, soon enough permit holders might have to call in every day to be verified.

### C.  Redundant, Repetitive Ammunition Background Checks Have No Historical Analogue

The Superintendent presents an assortment of xenophobic, outdated laws to support the challenged ammunition background checks. But in the Founding era, there is nothing to indicate that citizens had to prove they were not Indians, Frenchmen, or Papists every time they purchased gunpowder or a musket ball. American governments have not "required law-abiding, responsible citizens" to submit to never-ending ammunition background checks each and every time they

purchase ammunition. *Bruen*, 142 S.Ct. at 2131. New York's approach is, instead, novel and resembles that of traditionally disfavored prior restraints in First Amendment jurisprudence—one is not allowed to speak until those in power approve that speech. *See, e.g., N.Y. Times Co. v. U.S.*, 403 U.S. 713, 714 (1971). It should be equally disfavored here. In New York, one is not allowed to purchase ammunition until the powers-that-be approve a most important aspect of self-defense: the ammunition that makes the right to bear arms meaningful. History reveals what one federal court has already observed: ammunition background checks prior to each and every purchase has never been implemented in America. *Rhode v. Becerra*, 445 F.Supp.3d 902, 931–32 (S.D. Cal. 2020).

New York's novel, never-ending ammunition background check system has no historical analogue and is presumptively unconstitutional. When addressing historical sources, "not all history is created equal." *Bruen*, 142 S.Ct. at 2136. Constitutional rights are "enshrined with the scope they were understood to have *when the people adopted them*." *Id.* (quoting *Heller*, 554 U.S. at 634–35). Relevant historical markers include dates of the adoption of the Second and Fourteenth Amendments in 1791 and 1868. Historical evidence that "long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Bruen*, 142 S.Ct. at 2136. The historical shelf life of the laws in question is problematic. In *Bruen*, the Court gave virtually no weight to the evidence of long-historic Colonial American restrictions on arms. *Id.* The Superintendent's reliance on pre-Founding Era laws carry correspondingly little weight here.

The Superintendent's laundry list of racist, xenophobic, discriminatory laws does "not illuminate the scope of the right" since legal and constitutional conventions have thankfully changed. *Id.* Courts do not embrace *Korematsu* as a standard bearer today to analyze racial

discrimination. *Korematsu v. U.S.*, 323 U.S. 214 (1944). This Court should not embrace discriminatory laws no longer relevant in our American legal system to decide the constitutionality of New York's purchase-by-purchase ammunition background checks.

The Superintendent's reliance on restrictions made applicable to Native Americans offers no insight whatsoever into the constitutionality of New York's never-ending ammunition background checks. Native Americans were not understood to "be a part of the 'political community' of persons protected by the Second Amendment." *U.S. v. Harrison*, 22-CR-328, 2023 WL 1771138 (Feb. 3, 2023 W.D. Okla.) (citing *Scott v. Sanford*, 60 U.S. (19 How.) 393, 404 (1856)). It was only with the Indian Citizenship Act of 1928 that Native Americans were granted full citizenship. Pub. L. No. 68-175, 43 Stat. 253 (1924). These sources bear no relevance to the question before this Court.[3]

The Superintendent's further reliance on sources that restricted arms and ammunition ownership for Catholics or loyalists is also problematic. The disarmament of Catholics or loyalists was connected to a broader theory that these people were inherently untrustworthy.[4] And this disarmament was part of a wholesale eradication of distrusted group's civil liberties.[5] For example, a guiding principle of the American Revolution held that Tories simply

---

[3] True enough, the Superintendent cites some colonial laws to restrict trade with Frenchmen as potential support to bar Frenchmen from purchasing ammunition. *See* ECF No. 19 at 31 n.11. If New York has current concerns over Frenchmen obtaining arms or ammunition, it is free to advance these.

[4] James Madison criticized European reluctance of being "afraid to trust the people with arms" in Federalist 46. THE FEDERALIST 46, at 299 (James Madison) (Clinton Rossiter ed., 1961).

[5] *See* Leonard W. Levy, EMERGENCE OF A FREE PRESS 173, 181 (1985) (examining civil liberty issues related to Tories and the holding that, for example, Virginia's free press clause did not apply to Tory opinions).

> had no civil liberties."[6] Colonies regularly violated what would come to be the
> First, Fourth, and Fifth Amendment rights of untrustworthy groups. They also
> disarmed them in violation of what would become the Second Amendment.
> Thankfully, American constitutional jurisprudence has come a long way since
> we eradicated fundamental rights and liberties based on whether we thought
> members of certain ethnicities, religions, or political groups were
> "trustworthy."[7]

It is shameful and inappropriate to rely on outdated, antiquated considerations in this case.

*Harrison*, 2023 WL 1771138 at *22.

New York's batch of historical sources are too distant to be relevant and relate to antiquated

laws that denied fundamental civil liberties, often to oppressed groups. They are not an appropriate

basis upon which to analyze the constitutional propriety of New York's never-ending background

checks for ammunition purchases. As it remains, and as one other court noted: a "background

check required each time ammunition is purchased has never been implemented before." *Rhode*,

445 F.Supp.3d at 931–32.

Outside of laws restricting Papists, Indians, and distrusted people, one class of historical

laws relied on by the Superintendent should be briefly discussed. The Superintendent's Exhibits

15 through 17 reference Revolutionary War era loyalty oaths, such as the recommendation by the

Continental Congress that individuals be disarmed unless they swore such an oath.[8] ECF No. 19-

---

[6] C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 725 (2009) (internal quotations and citations omitted).

[7] The Superintendent might be tempted to rely on more modern sources of racist and outdated laws prohibiting arms or ammunition sales to free blacks in the South. For example, southern courts sometimes considered free blacks to be "second class" or "non-citizens" who did not enjoy the protection of the Second Amendment. *See, e.g.*, *State v. Newsom*, 27 N.C. (5 Ired.) 250, 254 (1844). Thankfully, continued reliance on laws that deprived whole groups of fundamental civil liberties enjoys no countenance in modern American constitutional jurisprudence.

[8] 4 JOURNALS OF THE CONTINENTAL CONGRESS, 1774-1789, at 205 (Washington Chauncey Ford ed., 1906).

18 – 19-20. These appear common in Massachusetts, Virginia, and Pennsylvania. Thus, three of thirteen colonies appear to have employed these loyalty oath disarming provisions—hardly a majoritarian trend.

The use of loyalty oaths in three colonies has limited application. Disarmament may occur when a person, if armed, would pose a genuine threat of immediate danger to others. To the extent the three colonial laws reflect a broader historical analogue it is for the unsurprising proposition that, in war time or times of domestic unrest, civil liberties may be diminished. This only parallels First Amendment jurisprudence. *See, e.g.*, *N.Y. Times Co.*, 403 U.S. at 726 (Brennan, J., concurring) (First Amendment liberties remain protected during war time except for the most guarded governmental information, such as troop locations); *Near v. Minnesota*, 283 U.S. 697, 716 (1931).

Should New York harbor concerns about domestic unrest or wartime loyalties, it may present them here. New York retains limited authority to employ ammunition background checks should it present credible concerns over civil war or an incoming invasion of, say, the *bérets verts*—the French green berets. Assuming these circumstances are not present, relying on wartime provisions to limit the sale of ammunition bears no relevancy to the question before this Court.

The Superintendent's argument in support of New York's ahistorical, never-ending background checks for ammunition purchases also fails for a second reason by embracing a definitional fallacy. *Bruen* places the burden on the state to demonstrate an "enduring American tradition" of "relevantly similar" laws. 142 S.Ct. at 2132. So much of the Superintendent's arguments rely on outdated, racist, xenophobic considerations, no longer relevant in American jurisprudence. But he also errantly conflates restrictions on arms purchases with restrictions on ammunition purchases. Although both are protected by the Second Amendment, ammunition is

not "arms," and arms are not "ammunition." *See arms*, MERRIAM WEBSTER ("a means (such as a weapon) of offense or defense"); *see also ammunition*, MERRIAM WEBSTER ("the projectiles with their fuses, propelling charges, or primers fired from guns"). Thus, the fact that some states placed restrictions on arms purchases does nothing to establish their validity for ammunition purchases.

"[T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. By relying on xenophobic and outdated laws, the Superintendent has failed to meet his burden here. Once it is shown that the historical pedigree of support for ammunition background checks is lacking, *Bruen* instructs that no further "means-end scrutiny" should apply. *Id.* at 2127. Post-*Bruen*, there are no "judge-empowering interest-balancing" inquiries. *Id.* at 2129 (internal quotations and citations omitted). Instead, the law is simply unconstitutional.

### D.  The Fees Charged Per Background Check Per Ammunition Purchase Are Unconstitutional

Prior to *Bruen*, in the context of fees made applicable to arms purchases, courts have regularly borrowed from First Amendment licensing caselaw. *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013). This is because there is an overlap between the scope of the First and Second Amendments. *See McDonald v. City of Chicago*, 561 U.S. 742, 801–02 (2010) (Scalia, J., concurring). In that context, the Supreme Court has held that fees will be upheld if they are designed "to meet the expense incident to the administration of the [licensing statute] and to the maintenance of public order in the matter licensed." *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941). Post-*Bruen*, courts are instructed with a simpler and stricter approach: government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S.Ct. at 2130. For reasons noted above, the Superintendent's laundry list of xenophobic and racist laws fails to do this.

For most, arms are purchased infrequently while ammunition is purchased much more regularly. Singular background checks that citizens encounter infrequently for the purchase of arms are of an entirely different categorical class than never-ending ammunition background checks citizens encounter each time they purchase ammunition. For many, ammunition purchases occur on a weekly or monthly basis. By comparison to First Amendment jurisprudence, arms background checks are like obtaining a once-a-year permit to parade down Main Street while ammunition background checks are like requiring everyone to get a daily permit to walk and talk on the sidewalks of Main Street. Absurd.

Cumulatively, New York's never-ending ammunition background checks impose a real burden for most law-abiding, responsible arms owners. Thirty-two percent of Americans report owning a firearm. Lydia Saad, *What Percentage of Americans Own Guns?*, GALLUP, Nov. 13, 2020,                https://news.gallup.com/poll/264932/percentage-americans-own-guns.aspx [https://perma.cc/N3NH-GPFF]. With a population of around 331 million, Americans purchase some 10 to 12 billion bullets every year. Peter Henderson, Daniel Trotta, *What's missing in U.S. gun control scramble? Bullets.*, REUTERS, Jan. 20, 2013,  https://www.reuters.com/article/us-usa-guns-ammunition/whats-missing-in-u-s-gun-control-scramble-bullets-idUSBRE90J02K20130120 [https://perma.cc/ZG4E-ZN7D]. For hobbyist and sport shooters, this number is much larger. Mathematically, the average, gun-owning American purchases just over 100 rounds per year.  Ammunition boxes generally hold twenty to fifty rounds.

Instead of being faced with a singular background check at the time of an arms purchase, residents of New York must pay a fee of at least $2.50 each time they purchase ammunition. This burden increases cumulatively with each purchase, making gunowners less likely to purchase ammunition or to be stocked with sufficient ammunition for self-defense, hunting, or sport

purposes. These considerations do not contemplate ordinary citizen-to-citizen exchanges of ammunition common among gunowners. As noted in the First Amended Complaint, Mr. DiPietro has 100 rounds of spare ammunition of .22 Long Rifle caliber that he would like to sell to Mr. Ortman for the price of $8.00, making the exchange in person. ECF No. 4 at 8 (¶26). For gun owners similarly situated to Messrs. DiPietro and Ortman, this amounts to a veritable 31 percent tax on that exchange. This only burdens the Second Amendment rights of these law-abiding, responsible citizens without any historical support for such a burden.

The Superintendent argues in favor of its $2.50 fee as if it were separate from the ammunition background check itself. But Plaintiffs' challenge attacks both interconnectedly. New York's $2.50 fee only applies when an ammunition background check has been performed. It does not fall into a generic category of sales tax or use fees, but rather exists to support the background check system. Plaintiffs challenge the law based on *Bruen*'s command that New York cannot sustain a never-before-implemented ammunition background check, whatever level of burden, without establishing appropriate historical analogues. That, then, is the crux of this challenge, as Plaintiffs' claim do not wade deeply into meandering arguments over whether a $1.00, $5.00, or $10.00 fee is appropriate. Rather, Plaintiffs' argument is more to the point: New York lacks authority, *ab initio*, to authorize its ahistorical never-ending ammunition background checks. *See Heller*, 554 U.S. at 634 ("The very enumeration of the right takes out of the hands of government— even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon").

Never-ending, cumulative ammunition background checks with attendant fees impose real burdens. Nothing in the Superintendent's list of outdated historical comparisons supports such an approach, leaving this Court with the task of invalidating this ahistorical law.

17

### E.  The Superintendent Has Not Contradicted Anything

The Superintendent's anemic representations that the background check system is working with any consistency whatsoever are belied by Mr. Dorr's experience, the sworn statements of myriad other law-abiding gun owners, and ongoing public news reports. ECF No. 4-1; Exhibits 1-10; s*ee also* Derek Heid, *'75% of our customers have been delayed': Ammo background checks continue to bring stores and customers issues*, WKBW Buffalo, Sept. 25, 2023, https://www.wkbw.com/news/local-news/75-of-our-customers-have-been-delayed-ammo-background-checks-continue-to-bring-stores-and-customers-issues  [https://perma.cc/FGC3-Q2TS]; Eric Tichy, *Local sheriff stymied in ammo purchase after new law kicks in*, Niagara Gazette, Oct. 22, 2023  https://www.niagara-gazette.com/news/local_news/local-sheriff-stymied-in-ammo-purchase-after-new-law-kicks-in/article_29afc2de-70fc-11ee-89b5-a7c6da014582.html [https://perma.cc/V6FX-VDTV].

For those who have been able to even utilize the ammunition background check database, the delays are often significant. David Porrata of Greece, New York waited three days to purchase some nine-millimeter ammunition. Exhibit 8. John Ryan of Troy waited several hours and had to return to the store to pick up his purchase. Exhibit 9. Robert Ralyea of Dundee has had an experience that is fit for a Kafka novel: after waiting *nine days* for an ammunition background check, he was unable to pick up his ammunition because a new background check for the purchase of a firearm was also flagged for additional review. Exhibit 10. This Court previously observed that "[t]here is no allegation of bad faith on the part of the State[,]" but the juxtaposition between the Superintendent's representations and reality warrants such an allegation. Regardless, even if the system was consistently functioning (and it is not), it is still unconstitutional.

### III.    Plaintiffs Have Demonstrated Irreparable Harm

The irreparable harm of ammunition background checks is ongoing, by both the system's very existence and by its consistent dysfunction. The Superintendent's unique arguments presented against a finding of irreparable harm should be rejected.

The Superintendent claims that the Plaintiffs were not diligent in bringing this case to the Court, and thus have failed to show irreparable harm. ECF No. 19 at 42. Although the CCIA passed on July 1, 2022, ammunition background checks did not begin under the law until September 13, 2023. *See* ECF No. 19-1 at 2 (¶6). That is, the Plaintiffs' Second Amendment rights were not actually infringed until that very day. *And on that very day*, they brought suit. ECF No. 1. That the Plaintiffs did not bring suit prior to having standing to do so, is not a lack of diligence; quite the contrary.

The Superintendent again reiterates that there is no case to be had taking the same background check for ammunition as one takes to purchase the firearm in the first place over and over again. Finally, he claims that the Plaintiffs' damages are strictly monetary, since, again, they would pass the background check they have already passed. ECF No. 19 at 42-43. The Plaintiffs have established the unconstitutional burdens of ammunition background checks and the fees to endure them, and seek injunctive relief from making these checks and charging the fees in the first place. The irreparable harm to the Second Amendment is ongoing across the state and in this District, and should be enjoined.

## IV.    The Public Interest Lies with the Right to Keep and Bear Arms

The public interest lies with law-abiding citizens enjoying the right to bear arms free of what is, at best, a prophylactic and redundant measure and is, in fact, closer to its worst: red tape retaliation. To be sure, the Plaintiffs are not challenging background checks for firearm purchases: it is simply that, having passed that background check, they should not be subjected to another check and fee, and another check and fee, and *another check and fee* every time they engage in an

antecedent to exercising the right to keep and bear arms. The public interest lies in restoring the free flow of ammunition, while leaving in place background checks for firearm purchases, which are not challenged here and, indeed, were likely approved in *Bruen*. As to the Superintendent's policy arguments, or assertions of governmental interests, they have no place here and, in any event, are easily remedied with policies that focus on crimes and criminals instead of law-abiding citizens.

## CONCLUSION

Having failed to infringe upon the Second Amendment with bans, New York's leaders have moved on to red tape with ammunition background checks. This tape should be cut here, now, and not in ten years. The Court should preliminarily enjoin the Superintendent's enforcement of the statewide record and database for ammunition purchases. At a minimum, the Court should order that ammunition purchases may not be prevented under N.Y. PENAL §§ 400.02, 400.03, and N.Y. EXEC. § 228 when the statewide record and database for ammunition purchases fails to work.

Dated: October 27, 2023.

Respectfully submitted,

Stephen R. Klein*
BARR & KLEIN PLLC
1629 K St. N.W. Ste. 300
Washington, DC 20006
(202) 804-6676
steve@barrklein.com

Benjamin Barr*
BARR & KLEIN PLLC
444 N. Michigan Avenue, Ste. 1200
Chicago, IL 60611
(202) 595-4671
ben@barrklein.com

/s/ Ginger D. Schröder
Ginger D. Schröder
Schröder, Joseph & Associates, LLP
394 Franklin Street, Second Floor
Buffalo, New York 14202
(716) 863-4000
gschroder@sjalegal.com

* *Pro hac vice* application pending.

*Attorneys for George Borrello, David DiPietro, William Ortman, Aaron Dorr and NYSFA.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2023, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and that copies were sent by email and to all counsel of record.

/s/Ginger D. Schröder