UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NEW YORK STATE FIREARMS ASSOCIATION, et al.

                            Plaintiffs,

                            Case # 23-CV-6524-FPG

v.

                            DECISION AND ORDER

STEVEN G. JAMES,[1] in his capacity as
Superintendent of the New York State Police,

                            Defendant.
_____

## INTRODUCTION

Plaintiffs have filed this action pursuant to 42 U.S.C. § 1983, seeking a declaration from the Court that Sections 400.02 and 400.03 of the New York Penal Law and Section 228 of the New York Executive Law are unconstitutional to the extent those statutes require the performance of a background check, and the payment of a fee for a background check, in connection with the purchase of ammunition. ECF No. 4 at 10 ¶¶ 1-2. Plaintiffs are also seeking an order restraining Defendant, Steven G. James, in his official capacity as acting superintendent of the New York State Police ("Superintendent"), from enforcing those same provisions. ECF No. 4 at 10 ¶ 3.

In connection with Plaintiffs' initial filing, Plaintiffs also filed a motion for a temporary restraining order ("TRO"), which the Court denied on September 21, 2023. ECF Nos. 5, 9. Presently before the Court is Plaintiff's motion for a preliminary injunction. ECF No. 5. For the following reasons, Plaintiffs' motion is DENIED.

## BACKGROUND

---

[1] Steven A. Nigrelli, formerly Superintendent of the New York State Police, was sued in his official capacity. By operation of Federal Rule of Civil Procedure 25(d), Steven G. James was automatically substituted upon assuming the office of Superintendent of the New York State Police on April 4, 2024, following his confirmation by the New York State Senate. The Clerk of Court is hereby directed to update in the case caption to reflect the name of the substituted party.

1

The following facts are taken from Plaintiffs' amended complaint and declarations submitted in opposition to the motion for a preliminary injunction by the Superintendent.

## I. The CCIA

The laws that Plaintiffs seek to have invalidated—Sections 400.02 and 400.03 of the New York Penal Law and Section 228 of the New York Executive Law—are a part of the "Concealed Carry Improvement Act" ("CCIA"), which was passed by the New York State Legislature on July 1, 2022. Under the CCIA, the Division of State Police ("NYSP") must establish "a statewide license and record database specific for ammunition sales," containing transaction information generated by licensed sellers. *See* N.Y. Penal Law § 400.02(2); N.Y. Exec. Law § 228. Information that must be kept includes the time of the transaction, the date, name, age, occupation, and residence of the purchaser, and the amount, caliber, manufacturer's name, and serial number on such ammunition. N.Y. Penal Law § 400.02(2)(a).

As of September 13, 2023, a background check is required with every ammunition purchase, with the check conducted by the NYSP. N.Y. Exec. Law § 228. The background check system is supported by a $2.50 fee paid by dealers. *See* N.Y. Exec. Law § 228(5)(a); ECF No. 19-1 ¶¶ 8, 16.

When an ammunition sale is made, a dealer contacts NYSP directly. ECF No. 19-1 ¶ 26. NYSP then performs searches against New York State data sources to determine if the purchase would violate 18 U.S.C. § 922(g) or equivalent state law. *Id.* ¶ 29. If no potentially disqualifying New York State records are identified, the transaction is approved and a "proceed" response is transmitted to the dealer or seller. *Id.* If any potentially disqualifying records are identified, the transaction is "delayed," and an examiner employed by the State Police reviews the application by hand. *Id.* The examiner will review the response, conduct any additional research required to

determine whether the purchaser can lawfully possess ammunition, and ultimately adjudicate the transaction as either a "proceed" or "deny." *Id.*

As of October 9, 2023, the NYSP processed 29,464 ammunition transactions, of which 29,037 (or 98.6%) were approved and 161 were denied (0.55%). *Id.* ¶ 33-35. The remaining 231 ammunition transactions were "delayed," or 0.78% of the total, while further human review was performed to determine whether the prospective purchaser may legally take possession of ammunition. *Id.* ¶ 36. Only 32 people appealed the denial of their background check, with 19 of those appeals ultimately being overturned. *Id.* ¶ 37. Of the eleven appeals upheld, eight were for mental health-related issues, two were based on state statutory disqualifiers (either a conviction for a "serious offense" under N.Y. Penal Law § 265.00(17) or an active Extreme Risk Protection Order under CPLR Article 63-A), and one was for a prior felony conviction. *Id.* ¶¶ 37-39.

As of October 13, 2023, the NYSP hired 29 full-time examiners for the ammunition background check process and reassigned seven sworn members to the point of contact unit. *Id.* ¶ 27. NYSP also procured space and equipment for the system. *Id.*

The money collected from background check fees goes to support the background check system, and only the background check system. N.Y. Exec. Law §228(5)(a). Section 99-pp of the New York State Finance Law requires that "all revenues" in connection with background checks are placed in a "background check fund," which may be used only "for the direct costs associated with background checks." N.Y. State Fin. Law § 99-pp(3).  If the revenue from background checks exceeds the expenses of administering the system, the money "shall remain in the background check fund" and "be used to reduce the amount of the fee." *Id.* § 99-pp(5).

II.   **FACTS**

Plaintiff William Ortman is a resident of New York. ECF No. 4 ¶ 7. On September 13, 2023, Ortman went to M&M Sports Den in Jamestown, New York to purchase ammunition. ECF No. 4 ¶ 24. However, when told that he would need to submit to a background check and pay a fee therefor, he declined to proceed with the purchase. *Id.*

Plaintiffs George Borrello and David DiPietro are both elected members of the New York State Legislature who voted against the CCIA, ECF No. 4 ¶ 5-6, and claim that "but for the background check and associated fee, [they] would purchase ammunition from licensed firearms dealers." ECF No. 4 ¶¶ 22-23.

The New York State Firearms Association ("NYSFA"), is a nonprofit membership organization with almost 10,000 members who live in New York state and own and possess firearms. ECF No. 4 ¶ 8. Plaintiff Aaron Dorr is the executive director of NYSFA and he also owns and possesses firearms. ECF No. 4 ¶ 9. On September 14, 2023, Dorr attempted to purchase ammunition from the WalMart in Canandaigua but alleges that the statewide license and record database was not operational, preventing him from completing the purchase. *Id.* ¶ 25. He alleges that he attempted to purchase ammunition from Runnings in Canandaigua but with the same result. *Id.* Dorr alleges that he would have otherwise completed the purchase despite the background check requirement. *Id.*

Plaintiffs DiPietro and Ortman further allege that DiPietro would like to sell ammunition to Ortman, but that they cannot engage in this transaction without incurring a $1,000 fine unless they "involv[e] a licensed dealer in firearms or registered seller of ammunition" or unless "Mr. DiPietro register[s] as a seller of ammunition." ECF No. 4 ¶ 26.

## DISCUSSION

4

Plaintiffs argue that the ammunition background check and associated fees imposed under the CCIA infringe upon their right to bear arms under the Second Amendment of the United States Constitution. "Disgusted" by this infringement, they seek to enjoin the Superintendent from enforcing this law and to have this law declared unconstitutional to the extent it requires a background check for purchasing ammunition. ECF No. 5-1 at 5. The Superintendent responds to Plaintiff's motion, first, by arguing that none of the Plaintiffs have standing to bring suit. ECF No. 19 at 15-20. The Superintendent also opposes the motion on the merits.  He argues that Plaintiffs have not properly shown that they are entitled to a preliminary injunction because they have not shown that there is a clear likelihood of success, nor have they shown irreparable harm or that the balance of equities and the public interest tilts in their favor. ECF No. 20-43.

### I. Standing

Standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir.2006). To establish Article III standing, "a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

#### A. Associational Standing

"It is the law of the Second Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). This case is brought entirely under section 1983 and NYSFA, the organizational plaintiff, makes clear that it is asserting "the rights of its members" as a basis for standing with no attempt to establish standing on its own behalf. ECF No. 24 at 8. Accordingly,

NYSFA does not have standing to bring this suit. The analysis should stop there, but NYSFA insists that it should enjoy standing to assert alleged injury to its members based on *Warth v. Seldin*, 422 U.S. 490 (1975) and its progeny, implying a mistaken belief that *Warth* creates tension with the law of the Second Circuit regarding organizational standing in Section 1983 cases such that the latter should be disregarded.

In *Warth*, the Supreme Court held that "in the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth*, 422 U.S. at 511. While this is a true statement of the law, this associational standing is conditioned on the "nature of the claim" and the "relief sought," such that "the individual participation of each injured party [is not] indispensable to proper resolution of the cause." *Id.* These nature-of-claim and relief-sought conditions continue to form the basis of the Supreme Court's organizational standing jurisprudence. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) ("An association has standing to bring suit on behalf of its members" so long as "*neither the claim asserted nor the relief requested* requires the participation of individual members in the lawsuit.") (emphasis added). Therefore, in order to establish standing under *Warth*, NYSFA must still show that the nature of the claim it brings does not require the individual participation of its members.

The rule in *Nbebe* fits neatly within *Warth*'s nature-of-claim condition because it is based on the Second Circuit's interpretation of Section 1983 claims as those that are "personal to those who are purportedly injured." *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984). Because these claims are personal to those that are injured, it necessarily follows that cases that bring these claims "require[] the participation of individual members." *Friends of the Earth, Inc.*, 528 U.S. at 181.

6

This understanding of Section 1983 claims continues to prevail in the Second Circuit and was recently the basis for dismissing an organizational plaintiff in Connecticut for lack of standing to the extent it asserted a violation of constitutional rights by way of Section 1983 on behalf of its members. *Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2d Cir. 2021) ("Because [organizational plaintiff] brought this case under 42 U.S.C. § 1983, it lacked standing to assert the rights of its members." (international quotations omitted)).

Although an organization may nevertheless bring a Section 1983 suit on its own behalf, so long as it independently satisfies the requirements of Article III standing, NYSFA makes no attempt to do so. *Nnebe*, 644 F.3d at 156. Rather, NYSFA insists that it "is not asserting its rights, but rather alleges that the rights of its members are in controversy." ECF No. 24 at 8.

The law is clear—organizations do not have standing to bring suits on behalf of its members under Section 1983. NYSFA is clear—it brings this case under section 1983 on behalf of its members. Accordingly, NYSFA has no standing. As a result, all claims asserted by NYSFA must be dismissed without prejudice. *See Green Haven*, 16 F.4th 67 ("Because the question of standing goes to the constitutional limitations on the "judicial Power of the United States," which is limited to resolving "Cases" or "Controversies," U.S. Const. art. III, we "are entitled at any time sua sponte to delve into the issue" of standing even if defendants do not raise the issue.").

### B. Individual Standing to Challenge Background Checks and Fees

The Superintendent challenges the standing of the individual Plaintiffs because they have not submitted themselves to the background check that they seek to have declared unconstitutional. ECF No. 19 at 10. Relying on the rule announced in *United States v. Decastro*, the Superintendent argues that in order "to establish standing to challenge an allegedly unconstitutional policy, a

7

plaintiff must submit to the challenged policy." 682 F.3d 160, 164 (2d Cir. 2012) (quoting *Jackson–Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir.1997)). The Court disagrees.

Recently in *Antonyuk*, the Second Circuit clarified that the rule in *Decastro* applies only in circumstances where a plaintiff challenges the eligibility criteria for obtaining ammunition rather than the application process for obtaining ammunition. See *Antonyuk v. Chiumento*, 89 F.4th 271, 309 (2d Cir. 2023). In cases where a plaintiff challenges "a component of the application process itself," the injury flows from that application process, and the law does not require a plaintiff to go through the process. *Id.*

Here, one of the criteria for obtaining ammunition is that a prospective purchaser's purchase does not violate 18 U.S.C. § 922(g) or equivalent state law. The background check is simply the process for determining whether or not the criteria is met. Plaintiffs are not challenging the criteria for obtaining ammunition rather Plaintiffs are challenging the process for determining whether the criteria is met.

Under these circumstances, the Second Circuit held that plaintiffs are not required to seek and be refused ammunition before challenging the constitutionality of the background check process. *Id.* at 311 ("when the plaintiff challenges the application process itself . . . he is *not* required to first apply for and be refused a license." (italics in original)). Accordingly, the Court finds that Plaintiffs have standing to challenge the background check process.

Because the fees that Plaintiffs challenge are incidental to the background check process that they challenge, the Court finds that the individual Plaintiffs have standing to challenge the fees as well.

### C.  Individual Standing to Challenge the Licensing Requirement

Finally, the Superintendent challenges DiPietro and Ortman's standing to challenge the portion of the CCIA requiring that they involve a licensed dealer in their proposed ammunition transaction between them because they have not shown that "there exists a credible threat of prosecution" under the challenged law. *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023).  In the Amended Complaint, Plaintiffs allege that DiPietro would like to sell 100 rounds of ammunition to Ortman for $8.00 but fears that he will be subjected to a fine of $1,000 if they do not involve a licensed dealer or registered seller of ammunition to act as an intermediary. ECF No. 4 ¶ 26; N.Y. Penal Law § 400.03(7)-(8).  Section 4003.03(7) reads: "No commercial transfer of ammunition shall take place unless a licensed dealer in firearms or registered seller of ammunition acts as an intermediary between the transferor and the ultimate transferee of the ammunition for the purposes of contacting the statewide license and record database pursuant to this section."  The Superintendent argues that there is no credible threat of prosecution because the prohibition only applies to "sellers of ammunition," which is defined as someone "who engages in the business of purchasing, selling or keeping ammunition." N.Y. Penal Law § 265.00(24).  In the Superintendent's view, DiPietro is not a "seller of ammunition" and therefore any transfers he undertakes are not subject to Section 400.03(7).  The Court disagrees.

First, the Court disagrees with the Superintendent's interpretation of section 400.03. If, as the Superintendent argues, that provision only applies to "sellers of ammunition," then it would be redundant to require a licensed dealer or seller of ammunition to be involved in the transaction because a seller of ammunition would necessarily be involved in every situation where paragraph seven would apply as a function of the provision only applying in circumstances with sellers of ammunition.

Second, for the purposes of standing, the Court "do[es] not defer to the government's interpretation of the statute," nor does it need to "to offer a definitive or comprehensive interpretation of the CCIA." *Antonyuk*, 89 F.4th at 336-37. Rather, the Court need only "consider whether the plaintiff's intended conduct is '*arguably* proscribed' by the challenged statute, not whether the intended conduct is *in fact* proscribed." *Id*. 336-37 (italics in original). Plaintiffs have stated that they intend to transfer ammunition between themselves and that neither is a licensed dealer or a registered seller of ammunition. Since the law requires a registered seller of ammunition or licensed dealer to act as an intermediary, Plaintiffs have described a desire to engage in a course of conduct that is arguably proscribed by the statute. Accordingly, the Court finds that they have demonstrated a credible threat of prosecution sufficient to establish standing to challenge this portion of the law.

## II.  Preliminary Injunction

### A. Legal Standard

Generally, a party seeking a preliminary injunction must ordinarily establish (1) "irreparable harm"; (2) "either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party"; and (3) "that a preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).

To succeed on the merits of their complaint, Plaintiffs must show that the challenged law is unconstitutional under the standard announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). There, the Supreme Court set out a new framework for analyzing constitutional challenges to laws under the Second Amendment. First, a court must consider

whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 17. If yes, then "the Constitution presumptively protects that conduct." *Id.* To overcome the presumption, "the government must demonstrate that the regulation is consistent with [the] Nation's historical tradition of firearm regulation." *Id.*

### 1. Ammunition is Covered by the Second Amendment

The relevant conduct at issue in this dispute is the purchase of ammunition. However, "the Second Amendment [only] protects 'arms,' 'weapons,' and 'firearms'; it does not explicitly protect ammunition." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). Curiously, Plaintiffs cite the Merriam Webster dictionary to argue that "ammunition is not 'arms,' and arms are not 'ammunition.'" ECF No. 24 at 20; *see also Arms*, MERRIAM WEBSTER ("a means (such as a weapon) of offense or defense"); and *Ammunition*, MERRIAM WEBSTER ("the projectiles with their fuses, propelling charges, or primers fired from guns"). It is unclear how in arguing this distinction, Plaintiffs expect to obtain the relief they seek when such distinction would clearly put ammunition beyond the protection of the Second Amendment. Nevertheless, the distinction that Plaintiffs seek to advance is unavailing because, although the Second Amendment does not protect ammunition directly, arms lose their deadly force without ammunition, which is why courts have consistently held that ammunition is protected by the Second Amendment. *See United States v. Miller*, 307 U.S. 174, 180 (1939) ("The possession of arms also implied the possession of ammunition."); s*ee also Jackson*, 746 F.3d at 967 ("Without bullets, the right to bear arms would be meaningless."); *Nat'l Ass'n for Gun Rts. v. Lamont*, No. CV 3:22-1118, 2023 WL 4975979, at *19 (D. Conn. Aug. 3, 2023) ("Components of firearms that are necessary to their operation, such as ammunition, are covered by the Second Amendment."). Therefore, the purchase

of ammunition enjoys derivative protection under the Second Amendment's operative clause that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

Defendant argues that background checks to purchase ammunition is not covered by the Second Amendment because the background checks and nominal fees do not constitute infringements. ECF No. 14-17. Citing a collection of historical definitions, Defendants make a compelling argument that the historical understanding of the word "infringe" refers only to significant or complete violations of the right. *Id.* at 15. This argument, however, is also unavailing, because the proper inquiry at this stage of the analysis is not whether a right under the Second Amendment is infringed, it is whether the "the Second Amendment's plain text covers an individual's conduct" at all. *Bruen*, 597 U.S. at 17. As discussed above, this Court concludes that the Second Amendment does cover Plaintiffs' conduct—the purchase of ammunition. Such conduct is therefore presumptively protected by the Second Amendment.

### 2. History and Tradition Analysis

Having determined that Plaintiffs' conduct falls under the protection of the Second Amendment, the burden now shifts to the government to "demonstrate that the regulation is consistent with [the] Nation's historical tradition of firearm regulation." *Id.* Specifically, the Court will consider whether there exists a history and tradition of background checks for ammunition, fees incident to background checks, and the requirement to involve a licensed dealer in a commercial exchange of ammunition.

#### a. Background Checks

The Court concludes that the ammunition background check requirement is consistent with "the well-recognized historical tradition of preventing dangerous individuals from possessing weapons." *Antonyuk v. Chiumento*, 89 F.4th 271, 307 (2d Cir. 2023).

There is no disagreement that dangerous individuals may be restricted from owning or possessing a firearm without violating the Constitution. *See United States v. Daniels*, 77 F.4th 337, 353 (5th Cir. 2023) (finding that the historical record "suggest[ed] a public understanding that when a class of individuals was thought to pose a grave danger to public peace, it could be disarmed.").

The government offers several historical examples of laws that were enacted to disarm dangerous individuals, but the Court will discuss only one of the many analogues offered. In colonial Virginia, the legislature dictated that no Catholics "shall, or may have, or keep in his house or elsewhere, or in the possession of any other person to his use, or at his disposition, any arms, weapons, gunpowder or ammunition" because it was determined that "it is dangerous at this time to permit [Catholics] to be armed." VII William Waller Hennig, *A Collection of all the Laws of Virginia* 35 (1820), ECF No 19-17 at 4.

Although Plaintiffs argue that this law is "problematic" because it targets a group of people because of their religion in clear violation of religious liberties guaranteed by the Constitution, ECF No. 24 at 17, it does not undermine the basic principle animating the law which is the determination of dangerousness. ECF No. 24 at 17. The problematic aspect of this law is that religion is the basis upon which the legislature determined that a particular group was deemed dangerous. However, ignoring the invidious discrimination informing the determination of what constitutes dangerousness, the legislature's decision to restrict gun (or ammunition) ownership because of the prospective owner's dangerousness is perfectly permissible under the Second Amendment and well-established in the historical tradition of gun regulation in America. *See United States v. Daniels*, 77 F.4th 337, 353 (5th Cir. 2023) ("Even if the disarming of . . . Catholics

13

was limited to exigent historical contexts, no party identifies disputes regarding the lawfulness of such prohibitions at the time.") (internal quotations omitted).

It is also undisputed that states are permitted to employ mechanisms to "ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Bruen*, 597 U.S. at 38 n. 9. Again, the historical record reflects this well-established tradition of the state assuring itself that a gun owner will behave responsibly after the purchase of a firearm. For example, where states disarmed Catholics, some Catholics were able to overcome disarmament by taking an oath of loyalty. Although an oath and a background check are distinct in their mechanisms, they are analogous in their objective as well as in how they are situated in the process of purchasing a firearm. Their objectives are the same in that they both serve to assure the state that the purchaser would be a law-abiding, responsible gun owner. Their mechanisms are distinct in that a background check investigates the purchaser's past to determine future behavior, whereas the oath relies on a present-day promise of the purchaser's future behavior. In both cases, the state is looking to assure itself of safe future behavior. They are also both equally situated in the process of purchasing a firearm in that they are both pre-purchase burdens employed to confirm the objective. Even absent the foregoing analysis of an analogous historical law, the case law also firmly establishes this understanding of history—that background checks are permissible to determine future safe behavior with arms. *See Antonyuk v. Chiumento*, 89 F.4th 271, 330 (2d Cir. 2023) (describing backgrounds checks as having long been permissible); *Allen v. D.C.*, No. 20-CV-02453, 2024 WL 379811, at *3 (D.D.C. Feb. 1, 2024) ("Bruen suggests that [] objective standards could be deployed as part of a background check system.")

Because the historical tradition for background checks prior to purchasing a firearm or ammunition is clearly established, Plaintiffs' facial objection to the background checks must fail.

14

That said, "because any permitting scheme can be put toward abusive ends," the *Bruen* Court maintained that plaintiffs may challenge the Constitutionality of a background check system "where, for example, lengthy wait times in processing . . . or exorbitant fees deny ordinary citizens their right[s]." *Bruen*, 597 U.S. at 38 n. 9. Recognizing this alternative avenue to challenge the law, Plaintiffs have attempted to frame their challenge in such terms by arguing that ammunition background checks involve "*per se* lengthy wait times, whether they take minutes, hours, or days" because they create a "never-ending" burden for which "there is no historical analogue." ECF No. 24 at 7, 10.

First, Plaintiffs offer no support for their assertion that the ammunition background checks are "per se" lengthy other than by framing the requirement as "never-ending." *Id.* Moreover, this framing is fundamentally misleading insofar as it implies that background checks for firearms would or should end after the first instance. Plaintiffs are incorrect. Under federal law, when individuals seek to purchase a firearm, they must submit to a background check at each instance that they purchase a firearm. 18 U.S.C. § 922 (t)(1)(A). The CCIA merely imposes the same requirement for ammunition—a background check at each instance of a purchase. If, according to Plaintiffs, the ammunition background checks are "never-ending," then background checks for firearms are also "never-ending" because a background check for one firearm does not transfer over to the purchase of a second, third or fourth firearm. Therefore, the purported "never-ending" component to ammunition background checks is simply another way to say that background checks are required prior to each purchase of ammunition in the same way they are required prior to each purchase of a gun. However, as previously noted, nothing in the history of firearm regulation in the United States contradicts the widespread agreement that "restrictions which

prevent dangerous individuals from wielding lethal weapons are part of the nation's tradition of firearm regulation." *Antonyuk*, 89 F.4th at 312.

Second, Plaintiffs have also stated that "the average, gun-owning American purchases just over 100 rounds [of ammunition] per year," and "[a]mmunition boxes generally hold twenty to fifty rounds." ECF No. 24 at 21. Therefore, according to Plaintiffs' own statistics, a purchaser of ammunition would only need to submit to an instantaneous ammunition background check about two to five times per year. This alone does not rise to the level of a lengthy wait time that effects the denial of Second Amendment rights.

Plaintiffs also attempt to argue that the background check system causes unconstitutional delays in practice because of system malfunctions. However, the record before this Court and the allegations in Plaintiffs' complaint do not support a finding that Plaintiffs are likely to succeed in showing that the ammunition background checks are so lengthy in practice, that citizens are being denied their rights to bear arms. On the one hand, Plaintiffs offer declarations from ten other members of NYSFA who have encountered some kind of delay due to an alleged malfunction of the background check system. ECF Nos. 24-2-10.[2] Together, these declarations allege that the background check system was unavailable at certain periods of time at specific locations on September 19, September 28, October 10, October 14, October 20, October 24, and October 25. Because of the system's unavailability, these declarants allege that they were not able to complete

---

[2] Because these declarations offer additional evidence submitted for the first time in reply, the Superintendent has moved to strike these additional declarations. ECF No. 25. Indeed, Plaintiffs should have been more diligent in filing their complaint by including these declarations in their initial filing. However, because the Court finds that the Superintendent would not be prejudiced by the consideration of these additional declarations, the Court exercises its discretion to consider these additional declarations for the purpose of the present motion. *See Kingstown Cap. Mgmt., L.P. v. Vitek*, No. 20-3406, 2022 WL 3970920, at *1 (2d Cir. Sept. 1, 2022) (citing *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005)) ("The district court has discretion to consider arguments made and evidence submitted for the first time in a reply brief."). Accordingly, the Superintendent's motion to strike is denied.

their purchases. *Id.* On the other hand, the government has proffered a declaration which affirms that as of October 9, 2023, the NYSP processed 29,464 instantaneous ammunition background checks. *See* ECF No. 19-1 ¶ 33-35; *See also* ECF No. 19-1 ¶ 31 ("For transactions where no potentially disqualifying record is identified, the system returns a "proceed" response *immediately*.") (emphasis added). Even if those ten members of NYSFA experienced a lengthy wait time at the time of their individual purchases, those ten experiences are simply not enough to outweigh the tens of thousands of other background checks that the government says it has performed without incident. Accordingly, the Court finds that Plaintiffs are not likely to succeed on the merits of an as-applied challenge of the background check system either.

### b. Licensing

Plaintiffs also challenge the requirement that a seller of ammunition be licensed or that commercial ammunition transfers involve a licensed dealer. The historical tradition of requiring a seller of ammunition or firearms to be licensed is also well-established. As a Florida law from 1838 demonstrates, it has long been understood that the Second Amendment permits a state to impose a license requirement on those selling guns and ammunition. *See* 1838 Fla. Laws 36, ECF No. 19-23 (prohibiting anyone from selling certain weapons "until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars" in exchange for "a written certificate, stating that they have complied with the provisions of this act.").

Although this is only one law, it is "not dispositive whether comparable historical regulations exist in significant numbers." *Antonyuk*, 89 F.4th at 303. "[T]he absence in other jurisdictions of positive legislation distinctly similar to a proffered historical analogue does not command the inference that legislators there deemed such a regulation inconsistent with the right

17

to bear arms." *Id.* Moreover, since it is undisputed that a license to obtain a firearm is constitutionally permissible, it stands to reason that requiring a license to sell those same arms is also constitutionally permissible since the dealer would have to lawfully obtain the arms in order to sell them in the first place.

### c. Fees

Plaintiffs also complain of the background-check fee, arguing that "it is beyond the authority of government to precondition the exercise of an enumerated right on the payment of a special fee." ECF No. 5-1 at 8. Plaintiffs are incorrect for several reasons. First, the fee provision under CCIA is payable by the dealer, not the purchaser. Plaintiffs argue, however, that "licensed dealers are passing this fee onto purchasers." ECF No. 5-3 ¶ 21. Even assuming Plaintiffs are correct in their assertion, in the context of the Second Amendment, "imposing fees on the exercise of constitutional rights is permissible when the fees are designed to defray (and do not exceed) the administrative costs of regulating the protected activity." *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013). That is exactly how the background check fee under the CCIA is designed.

Under the CCIA, the money collected from background check fees goes to support the background check system, and only the background check system. N.Y. Exec. Law §228(5)(a). Section 99-pp of the New York State Finance Law requires that "all revenues" in connection with background checks are placed in a "background check fund," which may be used only "for the direct costs associated with background checks." N.Y. State Fin. Law § 99-pp(3). If the revenue from background checks exceeds the expenses of administering the system, the money "shall remain in the background check fund" and "be used to reduce the amount of the fee." *Id.* § 99-pp(5).

18

*Bruen* did not alter this settled principle, only cautioning that "exorbitant fees [that] deny ordinary citizens their right to public carry" may be constitutionally challenged on a case-by-case basis. *Bruen*, 142 S. Ct. at 2138 n.9. Plaintiffs have not made a specific challenge that the $2.50 fee is so exorbitant that their rights are being denied, but only make an argument that any fee whatsoever is unconstitutional. Even if Plaintiffs were to bring an as-applied challenge to argue that the CCIA background check fee was so exorbitant that their rights are being denied, it is unlikely that Plaintiffs' challenge would succeed because the $2.50 fee falls well below amounts previously approved as constitutional.

For example, in *Kwong*, the Second Circuit upheld a gun license renewal fee in the amount of $340. In the context of the CCIA, a gunowner would need to purchase ammunition on a weekly basis for more than two and a half years to reach the same fee amount. However, by Plaintiff's own estimation "the average, gun-owning American purchases just over 100 rounds [of ammunition] per year," and "[a]mmunition boxes generally hold twenty to fifty rounds." ECF No. 24 at 21. Therefore, assuming gun owners purchase ammunition only one box at a time, a purchaser of ammunition would only need to pay this minimal fee about two to five times per year, which amounts to only $5-$12.50 per year. That is far below the $340 deemed constitutional in *Kwong*.

Plaintiffs have not shown a likelihood that the challenged law is unsupported by a well-established historical tradition of firearms regulation which is a requirement for success on the merits of their constitutional challenge. Accordingly, Plaintiffs have not met their burden of showing they are likely to succeed on the merits of their Constitutional challenge. Absent a showing of a likelihood to succeed on the merits, the Court need not consider irreparable harm or the balance of interests, and Plaintiffs' motion must be denied. *See Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011) ("Plaintiffs must establish a likelihood of success on the

...
...
...
...
...

merits. Because we conclude that Plaintiffs have failed to satisfy this burden, there is no need to address the other prongs of the analysis.").

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction, ECF No. 5, is DENIED.  The Superintendent's motion to Strike, ECF No. 25, is DENIED. All claims asserted by NYSFA are DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.

Dated: May 2, 2024
       Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York